WHEELER v. THE NORTHERN COLORADO IRRIGATION CO.

1. The alternative writ of *mandamus* must state a cause of action, and its sufficiency in this regard may be tested by answer, as upon demurrer.

2. By the constitution, title to the unappropriated waters of the state is vested in the public, with a perpetual right to its use in the people.

3. A priority of right to this use for beneficial purposes is, with certain limitations, acquired by priority of appropriation.

4. After appropriation, except perhaps as to the quantity actually flowing in the consumer's ditch or lateral, the title remains in the public, with the paramount right of user, unless forfeited, in the appropriator.

5. To constitute a valid appropriation the water diverted must within reasonable time be applied to some beneficial use. But the priority of an appropriation may date, proper diligence having been exercised, from the commencement of the ditch.

6. The carrier acquires certain rights in connection with the water diverted, but it does not become a *proprietor* thereof.

7. It is a *quasi*-public servant, charged with certain duties, and subjected to a reasonable control. It has, in general, a monopoly of the business, and, at common law, could not coerce compliance with unreasonable regulations or charges.

8. But the constitution provides for a tribunal to fix the maximum rate, in case of disagreement, and forbids the enforcement of unreasonable demands in relation to the time and conditions of payment.

9. The carrier is entitled to compensation for carriage, but it cannot charge for the *right to use water* from its canal. Nor can it exact in advance a part or all of its transportation charge, for the remaining years of its corporate life, as a condition precedent to use for the current irrigating season.

10. Under the constitution the county commissioners can only be authorized to establish the maximum *amount* of the rate. They cannot be empowered to dictate the exact rate that shall be collected, or to fix the *time* or *conditions* of payment. The time and conditions of payment are proper subjects for legislation.

11. Prior to 1887 the statute did not authorize the county commissioners of a given county to establish a maximum rate if the head of the canal was located in another county.

12. The consumer's rights may be waived, and a voluntary contract as to these matters may be binding upon him.

13. Section 311 of the General Statutes is not repealed, and it commands the carrier, having water undisposed of, to furnish it, upon payment of the established rate, to the class of persons using it, in the manner named by the articles of incorporation. If the carrier has a rate of its own with which the consumer is satisfied, he is not required to apply to the commissioners to fix a maximum rate.

14. Upon tender of the rate fixed and compliance with reasonable regulations established, if the carrier has water undisposed of, the consumer is entitled to its use. And *mandamus* lies where his demand is refused.

15. The alternative writ of *mandamus* cannot be amended by substituting therein a new cause of action.

*Appeal from District Court, Arapahoe County.*

APPELLANT, as relator, instituted *mandamus* proceedings in the court below to compel the respondent company to

furnish him water for irrigation.` Respondent demurred to the alternative writ; the demurrer was sustained and judgment entered in its favor. From this judgment the present appeal was taken.

The following constitutional and statutory provisions are considered or referred to in the opinion:

### CONSTITUTION, ART. XVI.

SEC. 5. The water of every natural stream, not heretofore appropriated, within the state of Colorado, is hereby declared to be the property of the public, and the same is dedicated to the use of the people of the state, subject to appropriation as hereinafter provided.

SEC. 6. The right to divert unappropriated waters of any natural stream to beneficial uses shall never be denied. Priority of appropriation shall give the better right as between those using the water for the same purpose; but when the waters of any natural stream are not sufficient for the service of all those desiring the use of the same, those using the water for domestic purposes shall have the preference over those claiming for any other purpose, and those using the water for agricultural purposes shall have the preference over those using the same for manufacturing purposes.

SEC. 7. All persons and corporations shall have the right of way across public, private and corporate lands for the construction of ditches, canals and flumes, for the purpose of conveying water for domestic purposes, for the irrigation of agricultural lands, and for mining and manufacturing purposes and for drainage, upon payment of just compensation.

SEC. 8. The general assembly shall provide by law that the board of county commissioners, in their respective counties, shall have the power, when application is made to them by either party interested, to establish reasonable maximum rates to be charged for the use of water, whether furnished by individuals or corporations.

GENERAL STATUTES.

SEC. 311. Any company constructing a ditch under the provisions of this act shall furnish water to the class of persons using the water in the way named in the certificate, in the way the water is designed to be used, whether miners, mill men, farmers, or for domestic use, whenever they shall have water in their ditch unsold, and shall at all times give the preference to use of the water in said ditch to the class named in the certificate; the rates at which water shall be furnished to be fixed by the county commissioners as soon as such ditch shall be completed and prepared to furnish water.

· SEC. 1740. Any person or persons, acting jointly or severally, who shall have purchased and used water for irrigation of lands occupied by him, her or them, from any ditch or reservoir, and shall not have ceased to do so for the purpose or with the intent to procure water from some other source of supply, shall have a right to continue to purchase water to the same amount for his, her or their lands, on paying or tendering the price thereof fixed by the county commissioners as above provided, or, if no price shall have been fixed by them, the price at which the owners of such ditch or reservoir may be then selling water or did sell water during the then last preceding year. This section shall not apply to the case of those who may have taken water as stockholders or shareholders after they shall have sold or forfeited their shares of stock, unless they shall have retained a right to procure such water by contract, agreement or understanding, and use between themselves and the owners of such ditch, and not then to the injury of other purchasers of water from or shareholders in (the) same ditch.

Messrs. L. C. ROCKWELL C. W. WRIGHT and WILBUR F. STONE, for appellants.

Messrs. HUGH BUTLER, A. B. McKINLY and T. D. W. YONLEY, for appellees.

HELM, J.    The alternative writ of *mandamus* performs the office of the complaint in an ordinary civil action. It must state a cause of action, and failing to do so will not support a judgment. Its legal sufficiency may, by the return or answer provided for in the Civil Code, be challenged as upon demurrer and tested under the rules of pleading applicable to the ordinary complaint, when assailed by demurrer.

The alternative writ before us is somewhat informal and undoubtedly contains unnecessary matter; but, so far as mere form is concerned, we shall hold it sufficient without discussion, and proceed to consider the alleged substantial legal objections that are fairly presented by respondent's demurrer.

The subject of water rights has always been justly regarded as one of the most important dealt with in the legislation and jurisprudence of Colorado. Hitherto attention has been mainly directed to the adjustment of priorities and differences between individual consumers; but hereafter, owing to the rapid settlement of the eastern part of the state, the *status* of the carrier and its relations with the consumer will command the most earnest and thoughtful consideration.

For convenience I shall, throughout this opinion, use the terms "carrier" and "consumer," meaning the canal company and the tiller of the soil respectively.

The agriculturists in the territory mentioned are, with few exceptions, unable to convey water from the natural streams to their land. The annual rainfall is increasing; yet at present, without irrigation, but a small fraction of the producing capacity of the soil can be utilized, and, unaided, these consumers will for years to come be practically helpless. To the successful cultivation of that region the carrier and consumer are, therefore, equally indispensable. Hence a wise legislative policy and an intelligent judicial construction require a careful consideration of the privileges, powers and duties of the car-

rier, as well as the rights and obligations of the consumer. The courts should protect the consumer in the full enjoyment of his constitutional and statutory rights; but they should also jealously guard the rights of the carrier; and so deal with it (the constitution and statutes permitting) as to encourage the investment of capital in the construction of reservoirs and canals for the storage and transportation of water.

The pleadings in the case at bar show that respondent is a carrier and distributor of water for irrigation and other purposes. That its canal, two years ago, was upwards of sixty miles in length and capable of supplying water to irrigate a large area of land. That relator is one of the land owners and consumers under the canal, and can obtain water from no other source; also, that respondent has, undisposed, a sufficient quantity to supply his wants. That he tendered the sum of $1.50 per acre, the annual rental fixed by respondent, and demanded the use of water for the current season, but declined to pay the further sum of $10 per acre also demanded, and to sign a certain contract presented to him for execution. That respondent refused, and still refuses, to grant relator's request, except upon compliance with these conditions. The remaining essential facts will sufficiently appear in connection with the specific questions of law presented, as they are in their proper order discussed.

Does the record show a clear legal right of relator, from the enjoyment of which he is unlawfully precluded by respondent?

Our constitution dedicates all unappropriated water in the natural streams of the state " to the use of the people," the ownership thereof being vested in " the public." The same instrument guaranties in the strongest terms the right of diversion and appropriation for beneficial uses. With certain qualifications it recognizes and protects a prior right of user, acquired through priority of appropriation. We shall presently see that after appro-

priation the title to this water, save, perhaps, as to the limited quantity that may be actually flowing in the consumer's ditch or lateral, remains in the general public, while the paramount right to its use, unless forfeited, continues in the appropriator.   But to constitute a legal appropriation, the water diverted must be applied within a reasonable time to some beneficial use.   That is to say, the diversion ripens into a valid appropriation only when the water is utilized by the consumer; though the priority of such appropriation may date, proper diligence having been used, from the commencement of the canal or ditch.

The constitution unquestionably contemplates and sanctions the business of transporting water for hire from natural streams to distant consumers.   The Colorado doctrines of ownership and appropriation (as declared in the constitution, statutes and decisions) necessarily give the carrier of water an exceptional *status;* a *status* differing, in some particulars, from that of the ordinary common carrier.   Certain peculiar rights are acquired in connection with the water diverted.   It is unnecessary now, however, to enumerate these rights in detail.   For the present it suffices to say that they are dependent, for their birth and continued existence, upon the use made by the consumer.

But giving these rights all due significance, I cannot consent to the proposition that the carrier becomes a "proprietor" of the water diverted.

A cursory reading of the statutes might convey the impression that the legislature regarded the carrier as possessing a salable interest in this water.   And the constitutional phrase, "to be charged for the use of water," relating to the carrier's compensation, might at first glance seem to recognize a like ownership in such *use.* But construing all the provisions of that instrument bearing upon the subject *in pari materia*, the correctness of both of these inferences must be denied.   The

constitutional convention was legislating with reference
to the necessities and practical wants of the people. And
this body, in its wisdom, ordained that the ownership of
water should remain in the public, with a perpetual right
to its use, free of charge, in the people.

By section 8, article XVI, of the constitution, from
which the foregoing phrase is taken, the convention rec-
ognized the carrier's right to compensation for transport-
ing water, and provided for a judicial, or *quasi*-judicial,
tribunal to fix an equitable maximum charge where the
parties fail to agree.   It requires no citation of authority
to show that the words "purchase" and "sale," together
with other words of like import, used in this connection
by the legislature, must receive a corresponding interpre-
tation.   Under the constitution, as I understand it, the
carrier is at least a *quasi*-public servant or agent.   It is
not the attitude of a private individual contracting for
the sale or use of his private property.   It exists largely
for the benefit of others; being engaged in the business
of transporting, for hire, water owned by the public, to
the people owning the right to its use.   It is permitted
to acquire certain rights as against those subsequently
diverting water from the same natural stream.   It may
exercise the power of eminent domain.   Its business is
affirmatively sanctioned, and its profits or emoluments
are fairly guarantied.   But in consideration of this ex-
press recognition, together with the privileges and pro-
tection thus given, it is, for the public good, charged with
certain duties and subjected to a reasonable control.

Were the constitution and statutes absolutely silent as
to the amount of the charge for transportation, and the
time and manner of its collection, there would be strong
legal ground for the position that the demand in these
respects must be reasonable.   The carrier voluntarily en-
gages in the enterprise; it has, in most instances, from
the nature of things, a monopoly of the business along
the line of its canal; its vocation, together with the use

of its property, are closely allied to the public interest; its conduct in connection therewith materially affects the community at large; it is, I think, charged with what the decisions term a public duty or trust.    In the absence of legislation on the subject, it would, for these reasons, be held, at common law, to have submitted itself to a reasonable judicial control, invoked and exercised for the common good, in the matter of regulations and charges. And an attempt to use its monopoly for the purpose of coercing compliance with unreasonable and exorbitant demands would lay the foundation for judicial interference.    *Munn v. People,* 4 Otto, 113, and cases cited; *Price v. Riverside L. L. C.* 56 Cal. 431; *C. & N. W. R. R. Co. v. People,* 56 Ill. 365; *Vincent v. Chicago & Alton R. R. Co.* 49 Ill. 33.

But the constitution is not silent in the particular mentioned.    It evinces, beyond question, a purpose to subject this, as other branches of the business, to a certain degree of public control.    As we have seen, it provides for a tribunal to which the maximum amount of water rates may be referred, in case of dispute between the carrier and consumer.    And I think that, by fair implication, it forbids the carrier's enforcement of unreasonable and oppressive demands in relation to the time and manner of collecting these rates.    Any other view would accuse the convention of but partially doing its work.    For the fixing of maximum rates would be protection, grossly inadequate, if either of the parties might dictate, absolutely, the time and conditions of payment.    The primary objects were to encourage and protect the beneficial use of water; and while recognizing the carrier's right to reasonable compensation for its carriage, collectible in a reasonable manner, the constitution also unequivocally asserts the consumer's right to its use, upon payment of such compensation.

Any unreasonable regulations or demands that operate to withhold or prevent the exercise of this constitutional

right by the consumer must be held illegal, even though there be no express legislative declaration on the subject.

The contract which respondent required relator to sign and agree to comply with, as a condition precedent to the granting of his request, contains the following among other conditions: That he buy in advance "the right to receive and use water" from its canal, paying therefor the sum of $10 per acre; also that he further pay "annually in advance, on or before the 1st day in May of each year, such reasonable rental per annum, not less than $1.50 nor more than $4 per acre, as may be established from year to year" by respondent. If we hold respondent to the literal term used in this contract we must declare the $10 exaction illegal. Respondent cannot collect of relator the sum of $10, or any other sum, for the privilege of exercising his constitutional right to use water.

But counsel contend in argument that the foregoing expressions, quoted from respondent's contract, are not intended to require the payment of $10 per acre for a *right to use water*. They say this $10 is merely a portion of the annual "rental" exacted of consumers in advance for the remaining years of respondent's corporate existence; that instead of requiring, say, $2.50 per acre for each irrigating season in turn, respondent has seen fit to divide this sum into two parts, collecting $1.50 annually, and the residue of $1 each for the remaining ten years of its corporate life, as one entire sum in advance.

This construction of the contract may, under all the circumstances, seem plausible, though I doubt if the courts could accept it; but if accepted the difficulty under which respondent labors would not be obviated.

If the carrier may collect a *part* of its annual transportation charge in advance for the remaining years of its corporate life, it may collect *all*. Suppose the company just organized; under counsel's view the consumer may, there being no legislation on the subject, be com-

pelled to pay the cost of delivering water to him for the entire twenty years of its existence, before he can exercise his constitutional right during a single season.

But there is nothing in the law obliging him to cultivate his land for any particular period. He may not want the water for twenty years, or it may be utterly impossible for him to advance so large a sum at once. In fact, the majority of those who till the soil are too poor to comply with such a demand; to say that they must do so or have no water is to deprive them of their right to its use just as effectually as though the right itself had no existence. It is true these people would not themselves be able to bring water from the natural streams to their farms, and without the carrier they might be compelled to abandon their attempts at agriculture. This consideration, however, only reinforces the position that a reasonable control was intended. The carrier must be regarded as an intermediate agency existing for the purpose of aiding consumers in the exercise of their constitutional right, as well as a private enterprise prosecuted for the benefit of its owners. Yet, if such exactions as the one we are now considering are legal, the carrier might, at its option, in the absence of legislation, effectuate or defeat the exercise of this right; and we would have a constitutional provision conferring an affirmative right, subject for its efficacy in a given section to the greed or caprice of a single individual or corporation.

Besides the extraordinary power mentioned, the carrier would also, under counsel's view, be able to consummate a most unreasonable and unjust discrimination. B. could have water because he can pay for its carriage twenty years in advance; C. could not have water because he is unable to pay in advance for its carriage beyond a season or two.

But, say counsel, C.'s only remedy, and the only remedy of relator and other consumers dissatisfied with the carrier's terms, is by application to the county commis-

sioners. I reply: *First*, that so far as the present case is concerned, this suggestion embodies but little consolation. Relator's land is situate in Arapahoe county. The statute, as it stood when the proceedings described in the alternative writ took place, did not permit the commissioners of that county to act with reference to respondent's canal; while, under the constitution, the commissioners of no other county could exercise the necessary jurisdiction. It was utterly impossible, therefore, for relator to secure relief in the manner pointed out, and if the courts could not take cognizance of the alleged grievance he was wholly bereft of means of redress. I reply: *Second*, that the commissioners may be empowered to fix the maximum *amount* of the rate; that is, they may be authorized to announce a limit beyond which the carrier cannot go. In my judgment, under the constitution they cannot be vested with authority to establish the exact rate to be charged, or to specify either the *time* or *conditions* of payment. The time and conditions of payment are proper subjects for legislation. The legislature doubtless has authority to say that the rate, whether the carrier adopt the maximum fixed by the commissioners or establish one below such limit, shall be collected annually in advance for each irrigating season; or it can make any other reasonable regulations in these respects. But the legislature itself cannot establish the unreasonable rule we have been considering, which enables the carrier to accomplish a wholesale discrimination between consumers, and deny, if it chooses, to a majority of them, the rights secured them by the constitution. A regulation or rule entailing such results, whether established by the legislature or carrier, must be regarded as within a constitutional inhibition. This conclusion is not based merely upon the ground of private inconvenience or hardship; it rests, as will be observed, upon the higher and stronger ground of conflict with the beneficent purpose of our fundamental law.

A further consideration worthy of mention in passing, bearing at least upon the unreasonableness of the view urged upon us, is the position of the consumer who pays the charges for twenty years in advance. What assurance has he that the carrier can or will keep its engagement during that period? Its business is attended with considerable hazard, and requires large and continuing expenditures of money. The consumer may find himself without water, and dependent, for the recovery of his large advancement, upon the doubtful experiment of suit against an insolvent company.

To say that the courts may not interfere, under the circumstances above narrated, is to say that the clear intent of the constitution in relation to a constitutional right may be disregarded with impunity, simply because no express inhibitory constitutional or statutory provision on the subject can be found; also that, for a like reason, one charged with an important duty may condition its performance upon unreasonable and oppressive demands.

I do not usurp the province of the legislature by declaring what would be reasonable requirements as to the time and manner of collecting water rates. My position is that, for the reasons given, respondent's demand of $10 per acre, as an advance payment of part of the transportation charge for the remaining years of its corporate life, is illegal as well as unreasonable and oppressive.

Respondent's enterprise is of great public importance and benefit. The original construction of its canal cost large sums of money, and its running expenses are necessarily heavy. For a considerable period the capital invested must have been unproductive. These and other circumstances may be proper subjects for consideration by the commissioners, when called upon to establish a maximum rate. And whenever they become appropriate matters for judicial cognizance, the attention deserved will be received from the courts. But no expenditure, however vast, and no inconvenience, however great, can

justify or legalize the exaction, the consumer objecting, of the demand under consideration, as an absolute condition precedent to use for the current irrigating season.

I must not be understood as intimating that this demand is illegal *per se.* And if the consumer, prior to 1887, saw fit to waive his right by voluntarily submitting thereto, both the legislature and courts may be alike powerless to relieve him from the legitimate results of his contract.

When properly understood, the statutes, in so far as they relate to the principal subjects examined, harmonize with the conclusions above stated. Counsel's proposition, that only those consumers who have previously used water are permitted to demand it on payment of the rate established by the carrier, is not sound. The section upon which they rely (1740, Gen. St.) is simply an assurance of the right to *continue,* under specified circumstances, a use already exercised. It does not operate to repeal section 311 of the General Statutes; this section expressly commands ditch companies, having water in their canals not taken, to furnish the same to the class of persons using it, in the manner named by the articles of incorporation, upon payment of the established rate; the declaration therein that this rate shall be fixed by the county commissioners must be taken with the constitutional condition attached, viz.: "Where application is made to them by either party interested." But when the company has a fixed rate of its own, with which the consumer is satisfied, no necessity exists for the making of such application. If counsel's position were correct, the land owner *who has never had the use of water* would, so far as the statutes are concerned, be wholly at the mercy of the carrier. For section 1740 does not give *him* the right to water, even when the *maximum rate has been fixed by the commissioners.*

In view of the foregoing conclusions I need not dwell upon the legality of respondent's demand that relator, as

a condition precedent to the use of water for the season of 1886, enter into the written contract before us. This contract contains a number of conditions that appear unreasonable, and, as I construe the constitution and statutes, are of doubtful legality. But it is sufficient to recall the fact that the unlawful demand of $10 per acre for the right to use water is a conspicuous provision therein. Relator could no more be required to execute a contract containing this condition than he could be compelled to comply with the demand in the absence of contract.

It is not necessary to consider what would have been the result had respondent charged $11.50 per acre for the irrigating season of 1886, instead of demanding $1.50 for that season and $10 per acre as part payment for future years. Neither is it necessary to speculate as to what respondent would have charged for the season mentioned had the law been understood by its officers according to the construction above given. In view of the pleadings, and especially of the language employed in respondent's contract, I think that relator, upon the showing made, was entitled to the use of water from respondent's canal for the irrigating season specified in the alternative writ. This conclusion is emphasized by the defective condition of the commissioner statute prior to 1887, which left relator helpless so far as action by that body was concerned. I also think that *mandamus* lay for the enforcement of his rights in the premises.

The demurrer should have been overruled and the judgment must, therefore, be reversed, appellant recovering his costs.

But courts do not order the performance of impossible acts. This proceeding was instituted for the purpose of compelling respondent to supply relator with water during the irrigating season of 1886. Since then respondent may have changed its annual charge or rate; besides, the only tender or demand appearing in the record were for

that season. To order compliance with relator's request for 1886 would be absurd; to order a delivery of the water for 1888 would be unwarranted. To permit an amendment of the alternative writ, so as to cover the approaching irrigating season, would be to allow the substitution, in this proceeding, of a new and wholly different cause of action and to violate an established rule of pleading.

The judgment is reversed and the cause remanded.

BECK, C. J. I concur in the foregoing opinion of Mr. Justice HELM as to most of the propositions therein contained. In my judgment the district court had jurisdiction of this cause when it was before it, not upon the principal ground urged by the counsel for appellant, that there was no disagreement between the parties as to the price or compensation demanded by respondent for furnishing the water requested, but on the ground that the terms and demands exacted were unreasonable and illegal.

The record before us does not warrant the proposition of counsel, that, of the two sums of money demanded by the respondent, only the $1.50 per acre was for compensation for transporting and furnishing the water, and that the $10 per acre was wholly for royalty, gift or bonus. Possibly a large portion of the latter sum may have been a demand of this character, and consequently without consideration in law or fact.

The alternative writ states, but not wholly *in hæc verba*, the stipulations upon this point of the contracts required to be signed by the consumers of water. The statement is: " Said contracts, after reciting that, in consideration of the stipulations therein contained and the payments as therein specified, the said company, party of the first part, agrees to sell to the consumer of water, the party of the second part, '*the right to receive and use water from the canal of the first party*,' for irrigating the land described, for the sum of money named, and also

'*upon the further payment annually in advance, on or
before the 1st day of May in each year from the date
hereof, such a reasonable rental per annum, not less than
$1.50 per acre, and not more than $4 per acre, as may be
established from year to year by the first party.*'"

Appellant's counsel, in discussing the question of juris-
diction, construe the phrase above quoted from the con-
tract, "*the right to receive and use water from the canal
of the first party,*" as an attempt on the part of the re-
spondent company to sell a *right* which is, by the con-
stitution, dedicated to the people and vested in the public,
and which is, therefore, not a subject of sale. The lan-
guage may admit of criticism, but it is only slightly
variant from the language employed in the constitution
respecting the duty of the general assembly to provide
by law that the board of county commissioners, in their
respective counties, shall have power "*to establish rea-
sonable maximum rates to be charged for the use of
water*" furnished by individuals or corporations. And it
is not as objectionable as the phraseology of the statutes,
which includes such expressions as *selling water, furnish-
ing water for sale, purchasing water,* and the like.

Without any greater liberalty of construction than that
given the statutes, this contract might be construed to
mean, by "the payments as therein specified" for "the
right to receive and use water from the canal of the first
party," the *consideration* charged by the respondent
company for conveying water through its canal and
furnishing it for the use of consumers. Now the appel-
lant was unwilling to make all the payments *therein speci-
fied.* He tendered a portion thereof and refused to pay
the balance. Did not this action on his part fairly give
rise to a disagreement or dispute between the parties as
to the price to be charged for waters from the ditch? It
is my opinion that the nature of the disagreement came
clearly within the purview of both the constitution and
the statute. But for the defect, therefore, in the statute

(which deprived the appellant of any relief under it), it would have been obligatory upon him, before applying to the district court for relief against the unjust charges and terms imposed by the ditch company, to have made application to the county commissioners of Arapahoe county to establish the maximum rate which the respondent might charge. Therefore he might, or might not, have had a cause of action against the company, depending upon the course subsequently pursued by it. There being no gross wrong without a remedy, however, and the statute then in force affording the appellant no right to apply to said county commissioners to fix a rate, he was justified in applying to the court for relief in the first instance. Respecting the measure of relief which might have been granted, the writ being now *functus officio* as to its principal object, I express no opinion.

The respondent, however, could not legally require payment of the $10 per acre, or other sum, for a series of years in advance, whether it be regarded as compensation or otherwise. Any sum charged for *royalty* or as a *bonus* would be unconstitutional.

Except in so far as these views may not harmonize with the foregoing opinion, I concur therein.

*Reversed.*

Mr. Justice ELBERT not sitting.