8  246
8  260
8  246
s2bc 210

## The Farmers High Line Canal and Reservoir Company v. The People ex rel. Standart, Assignee.

**1. Mandamus.**

Mandamus is not an appropriate remedy to enforce private rights resting on contract, the legal right to which is not clearly established, or when it is apparent that the interests of third persons, who are not before the court, are necessarily involved.

**2. Same—Water Rights.**

In some cases parties may obtain a writ of mandamus to compel a canal company to deliver them water for irrigation for a particular season, where they would otherwise be remediless, if the right is not contested except for some collateral reason, and where the interests of third parties are not involved; but conflicting water rights or the duties and obligations of a carrier of water and its consumers cannot be determined in a mandamus proceeding.

*Error to the District Court of Jefferson County.*

Standart, as the assignee of Crippen, Lawrence & Co., filed a complaint in the district court and prayed that a mandamus issue against the Canal & Reservoir Company, to furnish the plaintiff twenty-five inches of water for use on a portion of section 11, township 3, 39 W. The plaintiff alleged title in himself coming by mesne conveyances from Eli Allen. After general allegations of title, he stated the basis of his alleged right. He set up a contract which is as follows:

" This indenture, made and entered into this 22nd day of March, A. D., 1873, by and between the Golden City & Arapahoe Ditch company, of the county of Jefferson, of the first part, and William Bomberger, et al., &c., of the second part, and Eli Allen and others, stockholders in the said ditch company, and owners of land under said ditch, of the third part,

" Witnesseth, that whereas, the said William Bomberger & Co., by a certain written agreement, made between said Golden City & Arapahoe Ditch company and the said Wil

liam Bomberger & Co., on the 20th day of March, A. D.,
1872, * * * did become the lessees of the right of way and
ditch of said company lying in said Jefferson county, and
are at this time in possession of said ditch and right of way
under and by virtue of said lease; and whereas, it is desired
to make certain other and further agreements for control
and management of said ditch, and furnishing water for irri-
gation for the lands owned at this time by the said several
parties of the third part from the said ditch, as well for the
accommodation of the said parties of the first and second
part as for the said parties of the third part, severally and to
each and every of their several assigns and vendees, lessees
and tenants of the said lands as now held severally by said
several parties of the third part under said ditch sufficient
water from said ditch for the irrigation of the lands now
owned or occupied, or cultivated, or which may be hereafter
cultivated by him or his assigns as any part of the lands now
owned or occupied by him under said ditch upon the terms
and conditions hereinbelow set forth, which said lands so
hereby intended to be irrigated from said ditch are set forth
by the numbers thereof in a schedule annexed hereto and
marked, 'List of Lands.' — Now it is hereby covenanted
and agreed on the part of the said William Bomberger &
Co., that the said William Bomberger & Co., shall pay off
all indebtedness and cost necessary to be paid in order
to secure the clear and complete right of way of and for
said ditch from the head of said ditch to Ralston creek, in
said Jefferson county, and to pay the fees of attorneys and
counsels now due from said company for legal services in
and about the incorporation thereof, and leasing and procur-
ing the right of way by condemnation for said company for
said ditch, and shall also pay the said stockholders, to each
his proportionate share, the sum of $3,500, on or before the
24th day of March, 1874, and the further sum of $3,500, on
or before the 24th day of March, 1875, for which said sums
the said William Bomberger & company shall give to each of
said stockholders their promissory negotiable note for the

amount of his share thereof, in payment for a transfer by him to said William Bomberger & company, of his share of stock in said ditch company, and further said William Bomberger & company, shall deliver to said stockholders, for the crop season of 1873, 1,200 inches of water, to be delivered in all respects according to the terms of said lease, in full for interest upon said two deferred payments for which said notes are to be given, said notes bearing no interest till due, and at the time of making said notes, said William Bomberger & company shall issue to each of said stockholders a certificate for water from said ditch for the year 1873, entitling him or her to receive his proportionate share of said 1,200 inches of water from said ditch, to be delivered as aforesaid.

" And the said parties of the third part, each for himself, hereby covenants to and with the said party of the second part, that, upon the making of the said promissory notes and certificates for water, he will assign, transfer and set over to the said party of the second part all the share or shares or parts of shares owned by him in said ditch company in due form of law, according to the by-laws and usages of said ditch company, and the said party of the first part and the said party of the second part, jointly and severally, for themselves and each of them, their successors, assigns, transferees and vendees forever, do hereby covenant with the said several parties of the third part, to each severally, and to his or her heirs, executors, administrators and assigns, vendees and transferees of the lands now owned or occupied by him under said ditch as set forth in said schedule ; that each and every of the said parties of the third part, his heirs, executors, administrators, assigns, vendees or transferees of the lands now owned by him as aforesaid, or any part thereof, shall by this indenture, from and after this date, have the right to receive and have delivered to them and each of them severally from said ditch of said party of the first part, during the crop season of the year A. D., 1873, and every year thereafter forever, so much water as may in fact be necessary and proper to amply irrigate all the lands under said ditch, owned

or occupied by him or her, his or her lessees or agents, being part and parcel of the land mentioned in said schedule; at all times from the 15th day of May unto the 15th day of November, in each and every year, said water to be furnished at the rate of $1. per inch, subject to all the terms and conditions as to delivery thereof mentioned in said lease for the delivery of surplus water to the stockholders of said ditch company, as therein provided, and to be ordered and paid for in the same manner as therein provided for the ordering and paying for the said surplus water, and subject to the further provision as in said lease, that there sufficient water in Clear Creek available to enable the said parties of the first and second part, or either of them, to furnish the water so required to be furnished."

There are other provisions which have been before this and the supreme court in a litigation between the company and one White. The case of the court of appeals is found in the 5 Colo. App., page 1. The supreme court opinion is in the 22 Colo., page 191. The balance of the contract is not stated, because it is wholly unessential to this decision, but it is referred to that it may be examined if the persons interested in the question may desire. After setting up the contract and its formal execution and delivery, the plaintiff proceeds to state that the owners of the land have used water which has been delivered by virtue of the agreement ever since its execution, though the amount used has been of different and varying amounts and quantities, as the necessities of the owners might require. Notice of the terms of this contract were said to have been brought home to the Reservoir Company, who bought with full knowledge of it. The plaintiff alleged a demand for the delivery of water, and an offer to pay the required sum, and a refusal. It was averred that crops were in danger of destruction, and damage would be likely to accrue if the contract was not enforced. The Reservoir Company defended and set up, in different pleas, divers defenses. These need not be stated, since the decision will not turn on the sufficiency of the pleas, nor the

adequacy of the proof to support them. On the trial the whole testimony was directed substantially to the establishment of the contract, proof of the user of the water by Allen, the source of it, and, in general, the acquisition by Allen, through the contract and the use of the water, of a right to demand and receive of the Reservoir Company in perpetuity the amount of water which the complainant claimed. The defense was principally directed to the overthrow of these contentions; to the proof of a virtual abandonment; the acquisition of rights by other parties to the water, whereby Allen and his grantees had lost whatever claim they had; and to proof that in reality his supply for a great many years had not come from the canal operated by the company. This is stated to show the issue presented, and the issue tried, and the object which the suit sought to effectuate. With respect to the danger and loss likely to accrue to the plaintiff from any failure of the Reservoir Company to deliver water, there was little evidence produced. The only thing on the subject was the evidence given by Allen, who stated generally that the land was under cultivation and needed water. The extent to which the land involved was being cultivated, what crops were on it, how much water it needed, whether this was the sole and only source of supply, and whether or not any emergency existed which required the issue and enforcement of this extraordinary writ, was nowhere made to appear.

In reality, the whole controversy between the parties rested on proof of the acquisition of rights by the execution of the contract, and by reason of the source of supply from which the water was drawn which Allen had used for many years, and the loss, if it had occurred. Incidentally, a question was made as to the claims of third parties, to whom water had been sold and delivered for many years, while Allen was getting his water elsewhere. On this was based, of course, the legal contention that the rights of third parties having intervened, there could be no adjudication as to the force and effect of this contract between Allen and the Reservoir Company without their presence, because if they had acquired

rights by reason of the nonuser by Allen, the company would be absolved from any delivery to him. All these matters were set up in some part of the several defenses pleaded, but, in reality, in such form as to amount to what might be termed "pleas of abandonment," with allegations of matter which would permit proof of such issue. There was no distinct averment that there was a defect of parties, and whether such a plea could have been made in a mandamus proceeding, or would have been available if made, will be left wholly undetermined.

The ditch owned and operated by the Reservoir Company was variously known as the "Arapahoe Ditch," the "Golden City & Arapahoe Ditch," and the "High Line Ditch." The construction of this particular ditch was begun in 1863, and enlarged and variously owned from that time on to 1883. Eli Allen was one of the earliest owners. The ditch seems to have been owned and controlled by a lot of individuals, who afterwards conveyed to Bomberger & Co., which firm gave their notes to the owners of the ditch as the consideration for the purchase, and entered into the contract which has been set out. It ran along for some time, and afterwards passed into the control of The Golden Canal Company, which held and operated it for a period. It was subsequently sold under foreclosure proceedings, and passed into the ownership of the present corporation. All these details are unimportant to the issue involved. Allen took water from this original ditch for some time. How long, is uncertain. He got his water not directly from the ditch, but by intermediary canals or conduits, to wit, Dry creek and the Eureka ditch. The water from the Arapahoe ditch came by overflow into Dry creek, where a dam had been put by Allen, or Allen and others, and was turned into the Eureka ditch, from which Allen took his water. It was admitted by the plaintiffs that Allen got his water through the Eureka ditch up to the year 1888. The supply from the Arapahoe to the Eureka ditch was not continuous. There were some other ditches in that locality called the "Reno" and "Juchem"

ditches. Under some sort of an arrangement, and at a time which the testimony leaves uncertain, the Juchem and Reno ditches were consolidated, passed into the possession of the then owners of the Arapahoe ditch, and the supply of water which was furnished the Eureka ditch came from the consolidated Juchem and Reno canals. These canals took their water directly from Clear creek, which was their source of supply. Just when the change was made from the Arapahoe ditch to the creek proper, through these connections, is not clear. It was stated by one of the witnesses that the dam in Dry creek went out in 1883, and had never been replaced. If this be true, and it seems to be, undoubtedly the Eureka got all of its water directly from the creek, through the Juchem and Reno ditch, from that time until 1888. During these five years at least, Allen got his water from Clear creek through the Juchem and Reno ditch, and not from the Arapahoe. The long time which has elapsed since the establishment of these various ditches, the change in their source of supply, and the change of ownership, has left some of these matters in considerable obscurity. When these ditches were sold to the Reservoir Company, the plaintiffs in error, the Juchem, Reno, and Eureka ditches did not pass by the transfer. They were reserved by the then owners of all the ditches, and the last three were consolidated and sold to Reno. Whether he still holds them, or where the title is, is not manifest, but it is unimportant. This statement clearly exhibits the real controversy sought to be litigated in this proceeding and the testimony on which it turned. On the conclusion of the evidence, the court entered judgment generally that a peremptory writ issue commanding the respondent to forthwith furnish the relator twenty-five inches of water from its canal for the irrigation of lands described, on payment of $25.00 under the order. There was no limitation in the judgment entry as to the delivery, other than what may be inferentially derived from the terms of the order. Whether the twenty-five inches was a single delivery and that was the entire scope and extent of the order,

or whether it was to be a continual delivery, is determinable only by construction.

From this order and judgment the company prosecutes error and brings the case here.

Messrs. OSBORNE & TAYLOR, for plaintiff in error.

Mr. R. H. GILMORE, for defendants in error.

BISSELL, J., delivered the opinion of the court.

The terms of this contract are again submitted to this court for consideration and construction.  The parties have changed, the character of the suit has been altered, but the end sought is exactly like that which was striven after in the suit of *White v. The Canal Company.*  We do not avoid the labor because of the difficulty of the proposition, nor because our conclusion may not be determinative of the question.  We are somewhat inclined to criticise counsel, who possibly exercise nothing more than their statutory right, when they bring causes here of which the supreme court has the final determination.  It tends to work a little injustice and hardship on other litigants, and imposes on this court an unusual and an undue proportion of the appellate work of the state. Under these circumstances, we may be quite excused if we confine our decision of such cases within those limits which serve to express the results at which we have arrived, and suggest, rather than elaborate, the reasons on which our decision is based.  We do not intend to evade or attempt to escape a responsibility correctly laid on us to decide any questions, however difficult they may be, but we incline to the opinion our full duty is discharged if we go no farther than may be necessary to indicate the results.  This proceeding will relieve the other tribunal of the labor which might be involved in any possible review of our decision, and leave that learned and distinguished court entirely free to formulate its own conclusions.  They will undoubtedly be able to

lay more firmly the foundations of the law and assign better and more satisfactory reasons with which to support the judgment wherever they concur.

The reversal of this judgment is put on the naked ground that no case for mandamus is made by the proof. It is barely possible enough is alleged in the petition, had it been adequately supported, to warrant these proceedings. The course of the trial, the testimony offered, the lines on which the battle was fought, and the judgment of the court, all warrant us to reach the conclusion the sole purpose and object of the suit was to obtain a judicial construction of the contract and an establishment of a perpetual right in Eli Allen and his grantees to water from the Canal Company, and not to procure temporary relief from a breach of the contract on the part of the corporation. We are very much embarrassed in this discussion, because of the apparent difference between some decisions rendered by this court and opinions promulgated by the other. We are likewise hampered by the very great difficulty which we experience in concluding what rule the supreme court has declared in regard to this question. As we understand the adjudications, our decisions are not in conflict with those of the supreme court, and yet we find in the latter some cases which, without analysis and comparison, would seem to be at variance with our conclusions. The limitations which that court has placed on some of its statements of the doctrine lead us, however, to believe that we are in harmony, as we are bound to be, with that court in our statement of the law. Mandamus will not lie to enforce private rights resting on contract, unless the case be brought within the tolerably well settled rules respecting this extraordinary writ. The legal right to the writ must be clearly established. The courts will not interfere wherever it is apparent the interests of third persons, who are not before the court, are necessarily involved. This subject received quite elaborate consideration at the hands of the learned president judge of this court, as will appear from two opin-

ions which were written by him, in *Ditch Co. v. Maxwell*, 4 Colo. App. 477; *Bright v. Ditch Co.*, 3 Colo. App. 170.

One of these cases came up on demurrer, but the other undoubtedly decided that conflicting water rights, or the duties and obligations of a carrier of water, and its consumers, could not be legitimately determined in a mandamus proceeding. We see no occasion to change our conclusion in this particular, unless we are otherwise advised by the supreme court, nor do we think it controlled by the opinion of that court on similar questions. The matter has come before that learned court on several different occasions. The first declaration on the subject called to our attention is found in *Golden Canal Co. v. Bright*, 8 Colo. 144. It is followed by *Wheeler v. The Northern Colo. Irr. Co.*, 10 Colo. 582; *Townsend v. Fulton Irrigating Co.*, 17 Colo. 142; *Combs v. Agricultural Ditch Co.*, 17 Colo. 146.

These are the only cases cited, or which we have observed bearing on this question. The first case was quite an elaborate consideration of the question, and, speaking by one of its then judges, the court apparently held that mandamus would lie to compel the delivery of water to which a party was entitled by virtue of an established contract, where there was no controversy respecting the contract, and the contest was based on the existence of other sources of supply, a denial of a tender, and a failure to comply with the rules and regulations of the company. We are not disposed to contest that decision, or in any wise criticise it. Wherever there is no question about the contract and the duty, except what may come from the failure of the petitioner to comply with the regulations of the company, or to prove irremediable damage in case the corporation fails to discharge its obligations, we should not hesitate either to follow that court in its conclusion or to express our views in the same direction if it was an original proposition. The *Wheeler Case* pursued the same general line of argument, and is based on somewhat similar conditions. There the right to the water was conceded. The concession, however, was coupled with the limi-

tation that the user was bound to pay a certain fee. The contest between the parties was as to what should be paid to entitle the user to his water. Under such circumstances, mandamus was held to be a proper remedy, because it was made to appear that without the writ the whole crop would be lost and the user would be remediless. The court was not in entire harmony on all questions involved, though the one under consideration seems not to have been in dispute. This case was followed by those in the 17 Colorado. I conceive these decisions to be in harmony, though a casual examination would possibly lead to a different conclusion. The declaration in the *Combs Case* is " the right of mandamus has been held to be an appropriate remedy to compel the delivery of water for purposes of irrigation." Taken by itself, it seems to be a broad announcement of the rule that mandamus is always an appropriate remedy in cases of this description. We do not understand it to have been the purpose of the writer of the opinion, or of the court, to lay down a general rule to which there were no exceptions, nor to announce generally that in irrigation cases mandamus is an appropriate or proper remedy. That the remedy is both appropriate and proper in certain classes of cases has already been established, and this general statement must be taken in view of the cases wherein the law was thus laid down. The other case, to our mind, indicates what we believe to be true, that there are limitations on the right to resort to this procedure to establish the right to water. In the *Townsend Case*, the court says: "It is scarcely necessary to say that the writ of mandamus is not an appropriate remedy to secure a perpetual right to the use of water for irrigation." Of course, there was no attempt to express the limitations on the right to the writ, nor has there been any case in which the whole subject has undergone consideration to the extent necessary to enable us to determine what limits that learned court would place on the right to the writ. Being thus without the aid and benefit of any specific declaration by that court on the subject, we must decide the case according to our views of what the law

is in such cases.  As we have before intimated, we readily concede that in certain classes of cases parties may file their petition for a writ of mandamus to compel a carrier to deliver water for a particular and specific season, where they would otherwise be remediless, if the right is not contested except for some collateral reason, and where the interests of third parties are not involved.  According to the statement of facts preceding this opinion, the present litigation presents no such question.  It is really an attempt on the part of the petitioner to obtain an adjudication as to a perpetual water right for a particular piece of land.  It does not concern the delivery of water for the year 1894, nor for any other particular year, nor was the proceeding instituted in order to protect a crop then growing on the land, and being raised by the petitioner. The land is said to be under cultivation.  This is all that is said about it.  We do not know what, if any, crops were growing on it that year, nor whether they would be destroyed if the water was not delivered, nor was the evidence directed to the proof of the damages which would flow from the failure to deliver water in the particular season.  As we view it, there was no evidence that a crop would be lost if the water was not delivered, nor that the petitioner would be damaged by the failure.  All the testimony was directed to the establishment of Eli Allen's perpetual right to what is called " schedule water," by virtue of having been a party to the Bomberger contract.  The defense was rested principally on two propositions ; the one being an abandonment by Eli Allen of the right, if he ever had any, through his use of water furnished by the Juchem and Reno consolidated ditch from Clear creek itself through the Eureka canal, and the other the loss of this right by virtue of this user of the water through the Eureka ditch, and the sale and the use of water carried by the High Line canal, or as it was formerly called, the Old Arapahoe ditch, to persons who thereby became invested with a title and a right to the water.  In reality, there was nothing else litigated, and nothing else towards which any proof was offered.  There are some questions which are

tolerably well settled in this state.   One is that a corporation
owning and controlling a ditch and furnishing water to con-
sumers has no absolute title to the water, nor is a title ac-
quired except as the diversion by the company may unite
with the consumption by the user, so as to make a complete
appropriation.   With this fundamental proposition as a basis,
it is exceedingly clear that the plaintiffs in error acquired no
title to the water carried by the ditch, save to the extent to
which the use had combined with the diversion and made a
complete appropriation.   If it be true, as the evidence would
seem to show, that all the water which had been diverted in
that ditch had been put to agricultural uses by consumers,
there must have been a complete appropriation of the full
amount of water carried.   The relative rights of users of
water furnished by a corporation which transports it to the
land on which it is applied have not yet been definitely
decided in this state.   It has not yet been determined what
acts on the part of one of those users will, as between him
and the corporation and his coconsumers, amount to an aban-
donment of water to which title may have been acquired, so
that he may not be reinvested with the right by a subsequent
attempt to continue its application.   In other words, it has
not yet been settled whether a party may for a period inter-
mit its use, and the transportation company make title to a
subsequent purchaser who makes a constitutional application
of the water, and thus divest the original claimant and pur-
chaser of whatever title he may have enjoyed.   Since this
very troublesome question has not been settled, we do not
deem it wise to enter upon its discussion, or formulate or
even intimate what our views may be on the subject.   That
under different conditions, and in a different sort of a suit,
the question could be raised and discussed, and a decision
compelled as between these parties, there is no doubt.   If this
was any other than a mandamus proceeding, we should be
forced to construe the contract and determine what rights
accrued to Eli Allen thereunder, and whether those rights
were still preserved to his grantees and could be enforced by

them.  We do not believe they are properly presented in the present litigation.  We have concluded the present case is not a proper one for mandamus and that the petitioner was not entitled on this hearing, and on the proof which he offered, without more, to a judgment awarding him a writ which should compel the delivery of water.

The judgment itself is, in our opinion, erroneous, as it virtually amounts to an adjudication respecting a perpetual water right and was not limited to the delivery of twenty-five inches of water for any one particular year.  Had the judgment been thus limited, possibly error would not have been prosecuted, though we believe it would have made no difference, because the parties are evidently desirous to obtain a judicial construction of the contract.  Rights of third persons were shown to be involved, and those persons were not before the court, and a judgment respecting Eli Allen's rights, or those of his grantees, might operate to their prejudice.  It must be conceded no question was made in regard to parties, nor was there any proof offered by the company to show that all the water which they had diverted and transported had been bought and delivered to consumers.  It is quite possible that to make this objection available for the purposes of reversal some objection should have been made and some proof offered on this question.  The reversal is not put on this basis, but it is offered as a suggestion to illustrate the difficulties which might intervene if in this sort of a proceeding the court should undertake to adjudicate the rights conferred by the Bomberger contract.

We do not believe the evidence warranted the granting of the peremptory writ, or the entry of the judgment which is before us.  On the proof, the petition should have been dismissed and the party remitted to the settlement of their claims in a different form of action.  It is quite possible, if it became a controversy between the defendants in error, the Canal Company, and others, in respect to the enforcement of his right to twenty-five inches of water, an action must be brought on the statute to determine this question.  This

was the intimation of the supreme court in the *White Case* before referred to.   We do not pass on it or express our concurrence, because we are not clear what statutory provision was referred to.   We simply hold that mandamus was not an appropriate remedy to enforce the case made by the proof.

For the error committed by the court in entering its judgment, it will be reversed.

*Reversed.*