## No. 14,125.

BOARD OF COUNTY COMMISSIONERS OF JEFFERSON COUNTY ET AL. *v.* ROCKY MOUNTAIN WATER COMPANY.

(79 P. [2d] 373)

Decided April 4, 1938.   Rehearing denied May 31, 1938.

352

Mr. WILLIAM L. BOATRIGHT, Mr. HARRY BEHM, for plaintiffs in error.

Messrs. HINDRY, FRIEDMAN & BREWSTER, for defendant in error.

*En Banc.*

MR. JUSTICE YOUNG delivered the opinion of the court.

THE parties are here in reverse order of their appearance in the district court. There the Rocky Mountain Water Company was plaintiff and the Board of County Commissioners of Jefferson County and individual members thereof were defendants. They will be designated respectively as the company and the board. The judgment of the district court, which the board seeks to reverse, enjoined as unreasonable and confiscatory the enforcement of a rate of $2.50 an inch, fixed by the board under section 143, chapter 90, '35 C. S. A., as the carrying charge for water conveyed by the company through its ditch to a large number of consumers.

The company's ditch is approximately twenty-three miles in length, the headgate being located on Clear Creek. The users of the water—approximately 1,547 in number—are the owners of land, principally small tracts, aggregating 7,000 acres, a small part of which is located in the western part of the City and County of Denver, the remainder being adjacent thereto. These users secure the water on contracts entered into annually with the company. The testimony discloses that for purposes of distribution 40 inches of water is recognized as the equivalent of a cubic foot per second of time and that the carrying charge is fixed on the basis of so much per inch. For a number of years prior to the 6th day of June, 1935, the company had operated on a rate of $3.50 per inch. On the date last aforesaid, application by certain users having been theretofore made to the board of

county commissioners of Jefferson county to fix a maximum rate for the carriage of water, the board fixed a rate of $2.50 per inch. Following this act of the board the company instituted an action in the district court to enjoin the enforcement of the rate fixed as unreasonable and confiscatory. The court granted a temporary injunction and upon the hearing made that injunction permanent.

The rate fixed by the board was based on an allowance of $10,585 for operating expenses and a five and one-half per cent return upon the $130,200 par value of the outstanding capital stock of the company. On the basis of the diversion of approximately 190 cubic feet or 7600 inches of water, the gross return to the company under the rate fixed would be approximately $19,000. There was some evidence to the effect that the aggregate amount of water contracted for distribution did not exceed seven thousand inches, on which basis the average return would be approximately $17,500, which is slightly less than $17,746 which the commissioners found it necessary for the company to earn in order to pay its operating expenses and secure a reasonable return which it found to be five and one-half per cent on its investment.

In arriving at its conclusion and judgment the court found that the value of the physical property of the plaintiff devoted to a public use, including its structures, excavation, tools and equipment, furniture and fixtures, was $72,735.52, and that the value of its ditch right of way was $45,000, making a total of $117,735.52. The court further found that the value of the water rights diverted by means of the ditch and applied by the users to their land was $800,000 and that twenty-five per cent of this amount, or $200,000 should be included in the rate base, thus making a rate base valuation of $317,735.52, on which the company was entitled to a return. Summing up its conclusions as to the value of the rate base and as to its findings on operating expense, the court

said: "Accordingly, to recapitulate, the value of the plaintiff's property is fixed at the sum of $317,735.52, and its reasonable maximum operating and maintenance charges at $19,400." The court further stated in the decree that he did not "approve of a rate [of return on the rate base valuation] lower than six per cent."

None of the assignments of error challenges the court's finding as to the valuation of the physical property nor the finding that such valuation is a proper component of the rate base. Neither is there any assignment of error challenging the fixing of six per cent as a proper rate of return. The assignments of error do challenge the right of the court to fix a *maximum* annual sum for operating expenses and maintenance charge as being an encroachment on the powers of the county commissioners. The company does not assign cross error on this latter ground and we think the jurisdiction of the court to fix *maximum* annual operating and maintenance expenses may be left for determination until a time when the board has fixed a rate allowing such expenses in an amount in excess of the maximum fixed. We think the other assignments of error raise but two points which need be determined, namely: (1) Was it error for the court to include the whole or any part of the valuation of the water rights in determining the rate base? (2) Was it error for the court to fail to find the reasonable annual *minimum* operating expenses and maintenance charges which, together with six per cent return on the rate base, must be produced in order to prevent confiscation?

■■ The first point raises the principal contention between the parties, that is, as to whether or not the whole or any part of the value of the water rights involved shall be included in the rate base. We are of the opinion that it should not be included. To arrive at this conclusion it is necessary to analyze the situation presented where the ditch carrying the water from the

stream is owned by one party and the water applied by and to the land of others is obtained under annual contracts with the ditch owner. In the case here under consideration approximately 190 cubic feet per second of water was decreed to have been appropriated from Clear Creek for purposes of irrigation. The priorities are of sufficiently early dates that water is available for use throughout the irrigating season, practically to the full amount of the decrees. It is the contention of the company that by reason of its early diversions the users have been greatly benefited and owing to this fact the company should be entitled to a return on a rate base that includes the whole or a part of the value of these water rights. But while making such argument the company overlooks the fact that it may be contended with equal logic and force that there were users with equal foresight who secured and prepared land at great expense on which water might be applied to a beneficial use and by *their* foresight enabled the ditch company to divert water and convey it to their lands. As a result of the *foresight of both,* early appropriations were made and decrees confirming them afterwards procured. Neither the ditch company nor the users can claim any superior equities by reason of early priorities, since the appropriations decreed were of necessity dependent on their joint and practically concurrent acts. The cases in Colorado dealing with situations analogous to the one before us all hold that neither the ditch company alone nor the users alone are appropriators in the strict sense of that term. In *Wheeler v. Northern Colo. Irr. Co.,* 10 Colo. 582, 17 Pac. 487, speaking for the court, Mr. Justice Helm said: "The constitution unquestionably contemplates and sanctions the business of transporting water for hire from natural streams to distant consumers. The Colorado doctrines of ownership and appropriation (as declared in the constitution, statutes and decisions) necessarily give the carrier of water an

exceptional *status;* a *status* differing, in some particulars, from that of the ordinary common carrier. Certain peculiar rights are acquired in connection with the water diverted. It is unnecessary now, however, to enumerate these rights in detail. For the present it suffices to say that they are dependent, for their birth and continued existence, upon the use made by the consumer.

"But giving these rights all due significance, I cannot consent to the proposition that the carrier becomes a 'proprietor' of the water diverted.

"A cursory reading of the statutes might convey the impression that the legislature regarded the carrier as possessing a salable interest in this water. And the constitutional phrase, 'to be charged for the use of water,' relating to the carrier's compensation, might at first glance seem to recognize a like ownership in such *use.* But construing all the provisions of that instrument bearing upon the subject in pari materia, the correctness of both of these inferences must be denied. The constitutional convention was legislating with reference to the necessities and practical wants of the people. And this body, in its wisdom, ordained that the ownership of water should remain in the public, with a perpetual right to its use, *free of charge,* in the people." (Last italics mine.)

*Farmers' High Line Co. v. Southworth,* 13 Colo. 111, 21 Pac. 1028, was a case in which the three justices agreed as to the disposition of the case, but each wrote a separate opinion. Mr. Justice Helm said: "The constitution recognizes priorities only among those taking water from natural streams. Therefore, to constitute an appropriation such as is recognized and protected by that instrument, the essential act of diversion, with which is coupled the essential act of use, must have reference to the natural stream. But the consumer himself makes no diversion from the natural stream. The act of turning water

358

from the carrier's canal into his lateral cannot be regarded as a diversion within the meaning of the constitution; nor can this act of itself, when combined with the use, create a valid constitutional appropriation. There is therefore no escape from the conclusion hitherto announced by this court, that in cases like the present the carrier's diversion from the natural stream must unite with the consumer's use in order that there may be a complete appropriation within the meaning of our fundamental law. *Wheeler v. Irrigation Co., supra.*

"The carrier makes a diversion both in fact and in law. This diversion is accomplished through an agency (the carrier) recognized by the constitution and statutes, and for purposes expressly named in both; hence it cannot be challenged as illegal. It would undoubtedly become unlawful were the water diverted not applied to beneficial uses within a reasonable time, but, when thus applied, the diversion unquestionably ripens into a perfect appropriation. * * *

"The foregoing view is not a recognition of ownership in the carrier, *save of its canal;* nor does it in the slightest manner detract from the consumer's constitutional right of user. The carrier in and of itself has no independent priority (though the irrigation statutes use language that might give this impression), and any rights it may hold in connection with the water diverted depend for their continuance upon the use made by consumers. The carrier becomes the consumer's agent, and its labors clearly inure to his benefit. By taking from its canal the consumer recognizes and ratifies its acts of construction and diversion, making them his own. And the situation, so far as this question is concerned, is not different from what it would have been had the consumer in fact employed the carrier to construct the canal for himself alone." (Italics mine.)

In the same case Mr. Justice Elliott said: "The appropriation of water, within the meaning of the consti-

tution, consists of two acts—First, the diversion of the water from the natural stream; and second, the application thereof to beneficial use. These two acts may be performed by the same or different persons; but the appropriation is not complete until the two are conjoined. Hence, when the acts are performed by different persons at different times, it becomes necessary to determine which is the essential act to which the 'better right' attaches.

"It will be observed that, by the express language of the constitution, the 'better right' is guaranteed 'as between those using the water for the same purpose.' The different purposes specified are domestic, agricultural and mechanical. Whether there are other purposes not specified need not now be discussed. Can the carrier of water for hire be said to be using the water in the sense spoken of in the constitution? The railroad company, which carries farming implements from the great manufactories of the East to supply the farmers residing upon the broad prairies of the West, can hardly be said to be using such implements by the mere act of thus transporting them. From the specification of the purposes for which the water may be used it would seem that the 'better right' which attaches to the priority of appropriation was primarily intended for the benefit of those who apply the water to the cultivation of the soil or other beneficial use, rather than for the benefit of those engaged in diverting and carrying it to be used by others. The diversion and carriage of water in point of time are necessarily prior to the application of it to agricultural or other useful purposes; but they are subordinate in point of right. The former are to the latter as the means to the end,—an end without which neither the diversion nor the carriage would be lawful. The carrier is the agent, the consumer is the principal. The former can lawfully pursue his occupation only by virtue of the service he renders to the latter. The consumer's right is

primary and unconditional; the carrier's is secondary, and dependent.''

In *Combs v. Agricultural Ditch Co.*, 17 Colo. 146, 28 Pac. 966, it is said: ''Undoubtedly, those who by labor or by the payment of money, actually construct an irrigating ditch may thereby acquire a prior right to the water which may be diverted therein, *provided* they apply the same to beneficial use within a reasonable time after such diversion. But they cannot postpone the exercise of such right for an unreasonable time, so as to prevent others from acquiring a right to the water; nor can they thus acquire a right to dispose of the water contrary to the priority rule. Those who construct ditches and divert water for general purposes of irrigation must within a reasonable time apply the water to beneficial use; or else, upon proper application and for proper consideration, they must dispose of the same to those who are ready to make beneficial use of it. If ditch companies are unwilling to be charged with such duties and responsibilities, they must leave the water in the natural stream. The mere diversion of the water is not an appropriation of it within the meaning of the constitution; there must be an application of the water to beneficial use within a reasonable time or the diversion is unlawful. See *Farmers High Line C. & R. Co. v. Southworth,* 13 Colo. 111, and cases there cited.''

We think the following quotation from the opinion in *Combs v. Farmers' High Line C. & R. Co.*, 38 Colo. 420, 88 Pac. 396, clearly presents the resulting situation when the diversion is by a carrier and the application to a beneficial use is by another: ''In other words, the owner of the ditch is in this proceeding regarded as the representative of consumers thereunder, and, while the rights of the consumers to the use of water are distinct and independent of the rights of the carrier which transports the water for hire, yet the rights of the two combined constitute a completed appropriation, and it is the completed appropriation for which the decree is rendered. The decree em-

bodies the rights, not only of the carrier, whatever they may be, but also the rights of its consumers."

Judge Lewis in an opinion in *Pioneer Irr. Co. v. Board of Com'rs,* 236 Fed. 790, summarizes the holding of the foregoing Colorado cases and others cited by him as follows: "If I rightly understand these cases, they hold: (1) the owner of the carrying ditch in making the diversion from the natural stream acts solely as the agent or trustee for him who applies the water to a beneficial use, (2) gets no title in or right to the use of the water and has no property in it subject to disposal, and (3) he who applies the water thus diverted to beneficial use acquires a property right in the use of the water thus applied which he, and he only, can sell, dispose of and convey by deed separate and apart from the land to which it has been applied or with the land to which it has been applied. The last proposition is made more certain by *Strickler v. Colorado Springs,* 16 Colo. 61, 26 Pac. 313, 25 Am. St. Rep. 245; *Irrigation Co. v. Res. Co.,* 25 Colo. 144, 148, 53 Pac. 318, 71 Am. St. Rep. 123."

It should be observed further that as the act of diversion and the act of applying the water diverted to a beneficial use, whether performed by the same or different persons, are both necessary to constitute an appropriation, so the continued existence of the appropriation depends on the continuance of both, diversion and beneficial application. From this it follows that the company, having invested its capital in a ditch which ordinarily would be valueless except for its use in the conveyance of water, when one of its contract users fails to renew his contract, may contract for its use by another landowner in order that the right of appropriation may not be lost or diminished by abandonment with its consequent elimination or reduction of the amount of water that the ditch company may receive compensation for carrying. *Denver v. Brown,* 56 Colo. 216, 138 Pac. 44. It is to be noted also that the landowner is protected in his use because he has the right annually and perpetually to renew his contract to have

conveyed to him the proportionate part of the decreed priorities carried by the ditch for which he first contracted. As was said in *Denver v. Brown, supra*: "Having contracted for and beneficially used for irrigation purposes a specific volume of water for any particular year, without any valid limitation as to future use, he would be entitled to the same volume each year succeeding, when needed for the purposes of irrigation, upon tender, annually, without intermission, of the rate which the company could lawfully exact, and compliance with its rules and regulations, so far as reasonable. *Northern Colo. I. Co. v. Richards,* 22 Colo. 450, 45 Pac. 234; Sec. 2297, 2 Mills' Stats."

The landowner is protected from exorbitant charges for carriage by the provision of law authorizing the board of county commissioners to fix reasonable rates (for carriage). The company is protected from having its investment confiscated by its right to have the courts enjoin the enforcement of a rate that will not yield an income at least sufficient to meet operation and maintenance costs and an additional income such as will provide a return on its investment which is reasonable in view of the nature, character and extent of the benefits, if any, that accrue to the users.

From the foregoing analysis it appears that the issues here do not require a decision as to the ownership of water or rights of appropriations, but merely the determination of the rights and duties of the parties between themselves concerning compensation to be paid and received for the performance of certain services of the carrier incidental to the diversion and use of water under decreed priorities of appropriation. The landowners cannot use water unless the ditch company diverts it. Neither can the ditch company divert it unless the landowners use it. Each is dependent upon the other to bring a water right into existence; each is dependent upon the other for the continuance of its existence. The company made an investment in a ditch; the users made an investment in

their lands; the state gave them the water. In *Pioneer Irr. Co. v. Board of Com'rs, supra,* Judge Lewis sets forth very clearly the status of a ditch company in these words: "(1) The owner of the carrying ditch in making a diversion from the natural stream acts solely as the agent or trustee of him who applies the water to a beneficial use, (2) gets no title in or right to the use of water and has no property in it subject to disposal." The ditch company, once it has undertaken so to act as agent of the user and has devoted the necessary property and equipment to that service, acquires the right to continue as such agent and to be paid a reasonable compensation for its services and for the use of the property employed by it in rendering them. It does not use the water that it transports in any other or different sense than a railway company uses the freight which it carries. The ditch company does not own the water, nor the railway company the freight. The value of the freight carried is not a proper component of the rate base for a railway company, neither is the value of the water and appropriation under which it is carried a proper component of the rate base for a ditch company.

The court found the present value of the company's investment in construction, physical property and right of way to be $117,735.52, and that such valuation should enter into the rate base. No error is assigned to this either as to the values found or as to their inclusion in the rate base. We think the inclusion was proper. We are further of the opinion that under the record in this case the foregoing valuation constitutes the whole of the rate base on which the ditch company is entitled to a return.

That the use of water has been profitable to the landowners is immaterial in determining the rate base. The extent to which it has been profitable to the users is a factor that should be, and doubtless was, considered by the court in fixing what is a reasonable *return* on the rate base. If the water carried by the ditch is under a late priority and available only infrequently, and the results

of its use on the land of little value, the ditch company might be entitled to only a very small return on its rate base after provision was made for actual operation and maintenance charges. In fixing six per cent as the lowest rate of return on the rate base which he would approve, the court no doubt had in mind the fact that the water carried and applied on the lands has made them valuable and desirable for the purposes for which they are used and that the ditch company was entitled to a rate of return that would make its securities valuable and as desirable to the investor in securities, as the land is desirable for one who intends to engage in agricultural pursuits. For this purpose the effect of the use of the water on the land and the value of the water rights was proper for the court's consideration.

As to the second point raised by the assignments, we are of the opinion that it was error for the court to fail to find the *minimum* maintenance and operating expenses which must be provided by the rate fixed for carrying water in order that the rate be not confiscatory. The court found the value of the rate base to be $200,000 in excess of the valuation that we have herein determined to be proper. Reducing the value of the rate base by this amount has reduced by $12,000 the amount that any rate fixed for carriage need produce. The rate of $2.50 an inch fixed by the board, on the assumption that 7,000 inches of water are contracted for will produce $17,500. A six per cent return on the rate base of $117,735.52 which we have adjudged a proper base will require $7,064. The amount of the gross revenue left for operation and maintenance is $10,436.00, slightly less, but approximately the amount allowed for this purpose by the board. The trial court has found that the board may not allow *more than* $19,400 for operation and maintenance. The inference is that it may allow less and as a matter of fact it has allowed less. The court has found the rate of $2.50 an inch to be confiscatory but not having found the *minimum* that must be allowed for operation and maintenance, we have no means

of knowing whether or not the court thought the amount fixed by the board for operation and maintenance was high enough, but held the rate confiscatory because the $17,500 which the rate would produce was clearly insufficient to pay the $10,585.00 and six percent on a rate base of $317,735.52. In the view we have taken of what properly constitutes the rate base, a finding of minimum operating and maintenance expense is imperative.

The judgment of the trial court is reversed and the cause remanded. Further proceedings, if any, to be consistent herewith.