No. 19,384.

CITY AND COUNTY OF DENVER, ETC. *v.*
FREEDA CAROLINE MILLER, ET AL.
(368 P. [2d] 982)

Decided January 15, 1962.   Rehearing denied March 5, 1962.

Mr. GLENN G. SAUNDERS, Mr. ROBERT N. TRUNK, for plaintiff in error.

Mr. HARRY A. FEDER, Mr. MILTON MORRIS, Mr. PHILIP HORNBEIN, JR., Mr. HAROLD A. FEDER, for defendant in error FREEDA CAROLINE MILLER.

Mr. CHARLES T. BYRNE, for defendant in error North Washington Street Water and Sanitation District.

*En Banc.*

Mr. JUSTICE MOORE delivered the opinion of the Court.

IN the trial court the City and County of Denver was plaintiff and is plaintiff in error in this court. Freeda Caroline Miller, to whom we will refer as Miller, is the successor in interest of one Charles Miller and is one of the defendants in error. The North Washington Street Water and Sanitation District has no interest or claim except as the assignee of Miller and thus is bound by the determination of the rights of the latter.

Prior to February 8, 1918, Denver was the owner of the Farmers' and Gardeners' Ditch, the rights adjudicated thereto, and certain land under the ditch which was operated as the "Poor Farm" by the city. On the date above mentioned the city of Denver executed and delivered to Charles Miller a deed to sixty acres of the

said "poor farm" land. Said deed purported to convey to the grantee therein "* * * the perpetual use of sixty-two (62) inches of water from the Farmers' and Gardeners' Ditch * * *" subject to certain conditions and reservations not important here. Charles Miller occupied the land and used the said water in the irrigation thereof, and upon his death in 1938 his interest under the deed passed to defendant in error Miller who has since sold the land, reserving the water which she now proposed to convey to the other defendant in error, separate and apart from the land.

Denver asserts that although Miller has always used the water on the land and paid all assessments to Denver for carriage through the ditch, the purported conveyance of the water was a nullity because the charter of the city at the time the deed was executed and delivered contained the following pertinent provision: "* * * No plant [water] owned, acquired or constructed by the city and county and no water rights owned or acquired by the city and county shall ever be sold, leased or otherwise disposed of except upon a vote of the qualified electors first had and obtained, * * *." Denver city charter, Section 264-a, adopted May 17, 1910.

Miller contends that this charter provision applied only to the domestic water system of Denver; that the Farmers' and Gardeners' Water involved in this dispute was used on the Denver "poor farm" for irrigation purposes; and that in any event Denver's interest in the water has been lost by prescription, estoppel, or laches. The use of water, which is the basis of Miller's claim, aside from the claim under the deed, revolves around a discussion in the Miller brief of the cases which define rights of users under carrier ditches. Miller takes the position that a carrier ditch has no right, which is subject to disposition, in the use of water carried by the ditch.

■ Through a long line of cases starting with *Wheeler v. The Northern Colorado Irrigation Co.*, 10 Colo. 582, 17 Pac. 487 (1887), to *Board of County Com-*

*missioners v. Rocky Mountain Water Company,* 102 Colo.
351, 79 P. (2d) 373, there has been developed a clear
pattern of case law on the subject of carrier ditches. The
carrier creates the means of diverting water from the
natural stream, carrying it to the place where the con-
sumer can economically accept delivery from the carrier
ditch (along with other consumers) and apply it to ir-
rigation. Until the water has been actually applied to
beneficial use there is no water right.

■ The legal title to the decreed appropriation from
the natural stream, however, belongs to the carrier
which has a duty to protect it for the benefit of the con-
sumers under the ditch. The carrier also has sufficient
interest in the water right that unused rights of the con-
sumer do not cease to exist but may be held by the
carrier for sale to other consumers and thus no part of
the full decreed appropriation to the carrier ditch need
be abandoned to the source stream. Mutual ditches are
distinguished by the fact that the consumers are the
sole owners of the ditch and diversion works. They share
the costs of operation without profit while the carrier
ditch is entitled to a reasonable return on investment
over and above costs.

■ As carrier ditches were developed, historically,
they frequently had land, or arrangements with land-
owners, whereby a substantial appropriation of water
from a natural stream was made in anticipation of ripen-
ing that appropriation into a water right by selling por-
tions of it to consumers for use on the land. Some origi-
nal consumers failed to continue their use of the allo-
cated water and it was then sold over again, but once
the water had been applied to beneficial use the appro-
priation ripened into a water right. If the consumer dis-
continued use of his allocated water for some reason, the
quantity allotted to him did not lapse but remained part
of the whole appropriative right owned by the carrier
who could provide for other beneficial use of the water.

Out of this background another doctrine applicable to

carrier ditches developed, as exemplified by the opinion in *City and County of Denver v. Brown, et al.,* 56 Colo. 216, 138 Pac. 44. In that case the carrier was a beneficial user of water carried by the ditch and also had the obligations of a carrier to certain other users. A carrier ditch that also applies water to beneficial use has the right to legal ownership of the stream appropriation for all the water allocated to the ditch, and also the complete ownership of the ripened water right effectuated by application of a portion of that water to beneficial use by the carrier itself.

In the instant action it is conceded that Denver was owner of the carrier ditch, and it is also admitted that Denver was the beneficial user of the water in dispute during the time of the operation of the "poor farm" by the city. Thus, Denver was the owner of both the ditch and the ripened water rights. It follows that when the right of user came into the hands of Denver, the city did not hold, like the ordinary carrier, as a trustee for the next consumer. The city was itself the consumer of and held every element of legal and equitable ownership possible, with respect to the 62 inches of water at issue here.

Whatever interest Miller has must be based on contract, conveyance by deed, or must arise by operation of law. She cannot successfully contend that Denver, as owner of a carrier ditch, had no property right in the 62 inches of water in dispute, which was subject to disposal by the city. The fact that as to other water the Farmers' and Gardeners' Ditch acted as a carrier, does not prevent the city from making application of the 62 inches of water to beneficial use. By so doing the ripened water right became the property of the city. It could only be disposed of by full compliance with the charter provisions imposing limitations on the power of city officials to make disposition of water rights owned by the city.

At the time of the purported deed to Miller the charter limitation on authority of the city officials was

plain and free from ambiguity. We need not go beyond the terms of the charter to determine what the people meant by adopting it. The charter forcefully forbade disposition of a water right owned by Denver except by a vote of the people. Admittedly no vote of the people was had, hence no water right was conveyed by the deed.

The question next arises as to whether inaction of the city officials can be held to constitute laches, or give rise to prescriptive rights, and thereby make unnecessary a compliance with the charter provision. Under the facts disclosed by the record in this case it is unnecessary to determine questions raised in that connection.

Because the deed from the city to Miller could not and did not effectuate the transfer of any portion of the water right owned by the city, the conduct of the parties fixes the limits of their rights and obligations. The brief filed by Miller states that: "At all times during the 38 years after the execution of the deed in 1918 until the commencement of this action, the City continued to supply sixty-two inches of water from the Farmers' and Gardeners' Ditch to the Millers who used it to irrigate their farm." The farm having been disposed of, the water is now to be used, year around, elsewhere and for various purposes either through a conveyance by Miller to the other defendant in error or as provided by the contingent agreement between it and Denver, which appears in the record.

The new use is not the test of the rights of Miller. When the statement above quoted from the brief filed on behalf of Miller is analyzed, it appears that it is the "City" (Denver) which supplied the 62 inches of water from its ditch. The water so supplied was for the irrigation of the farm which has now been disposed of. Nothing in the record indicates any desire on the part of either of the defendants in error to continue to secure a supply to irrigate the farm. Any right to a perpetual supply, as referred to in the ineffective deed, is not to be inferred from 38 years of user plus the payment each

year of that year's fee for the use on, and carriage of the water to, particular acreage. It thus appears that any long usage which may have created rights was limited to a situation which no longer exists and therefore any determination with respect to it would be gratuitous and unnecessary.

For the foregoing reasons the judgment of the trial court is reversed and the cause remanded with directions to enter a decree to the effect that Miller has no title to the water involved.

MR. JUSTICE PRINGLE not participating.