## No. 25129

City and County of Denver, a municipal corporation, acting by and through its Board of Water Commissioners, and Adolph Coors Company, a Colorado corporation v. The Fulton Irrigating Ditch Company, The New Brantner Extension Ditch Company, The Platteville Milling and Irrigation Company, The Brighton Ditch Company, The Beeman Ditch and Milling Company, The Farmers Independent Ditch Company, The Lupton Bottom Ditch Company, The Platte Valley Irrigation Company, The Union Ditch Company, and The Western Mutual Ditch Company, and The Cache La Poudre Water Users Association, a Colorado corporation

(506 P.2d 144)

Decided June 19, 1972.      Rehearing denied February 26, 1973.

48

George L. Zoellner, Kenneth L. Broadhurst, James L. Petrock, Saunders, Dickson, Snyder & Ross, P.C., Glenn G. Saunders, for plaintiffs-appellants.

Leo Bradley, for Adolph Coors, Co.

Davis, Graham & Stubbs, John M. Sayre, William A. Hillhouse, II, Donald E. Phillipson, Gaunt, Byrne & Dirrim, for defendants-appellees.

Fischer and Beatty, for intervenor-appellee.

Leland M. Coulter, for amicus curiae City of Aurora.

Petersen, Evensen, Mattoon and Tracey, for amicus curiae Board of Water Works of Pueblo, Colorado.

Smart and Smart, P.C., for amicus curiae Colorado Open Space Council, Inc.

*En Banc.*

MR. JUSTICE GROVES delivered the opinion of the Court.

This is an appeal from the decision in a declaratory

judgment action by the plaintiffs, City and County of Denver (Denver) and the Adolph Coors Company (Coors). At issue are questions of Denver's rights in water obtained through transmountain diversions. These diversions are of water from the Colorado River basin, which naturally flows westerly from the west side of the Continental Divide to the Pacific Ocean. The waters are diverted to the South Platte River basin on the eastern side of the Continental Divide, the area in which Denver is located. The South Platte flows easterly, to the Missouri River. The defendant ditch companies divert water for irrigation purposes from the South Platte River downstream from the point of discharge of effluent from the plant of Metropolitan Sewage District No. 1 (Metro). Metro receives and processes Denver's sewage.

About half of Denver's water supply is Colorado River Basin water. Approximately 100,000 acre feet annually — an average constant flow of about 137 cubic feet per second of time — of this water is placed in the South Platte River in the form of sewage effluent. The water is originally diverted from three Colorado River tributaries, the Fraser River, the Williams Fork River and the Blue River. Water was first diverted from the Fraser River through the Moffat Tunnel in 1936; diversion of the Williams Fork River Water through the August P. Gumlick Tunnel commenced in 1940; and diversion of the Blue River Water through the Roberts Tunnel started in 1964.

Denver sought a declaratory judgment as to two questions:
1. Whether Denver may make successive uses of the diverted transmountain water while its dominion over the water continues.
2. Whether Denver may make an exchange of water under agreement with Coors dated December 4, 1969.

■ We hold that Denver, in the absence of an agreement on its part not to do so, (1) may re-use, (2) may make a successive use of, and (3) after use may make disposition of imported water. Further, we affirm the trial court in its determination that, by reason of an agreement dated May 1, 1940 to which Denver is a party, Denver may not exchange water under the Coors agreement.

## I.

The terms "re-use" and "successive use" have been used in the arguments with somewhat varying meanings. We add a third term, "right of disposition," and now define the three terms as used in this opinion.

■ "Re-use" means a subsequent use of imported water for the same purpose as the original use. For example, this could embrace the treatment of sewage resulting in potable water which is re-cycled into the regular water system.[1]

■ "Successive use" means subsequent use by the water importer for a different purpose. This includes the practice of the City of Aurora and possibly other municipalities which treat sewage containing imported water for further use by the city for irrigation of public parks and facilities and for industrial uses.

■ "Right of disposition" means the right to sell, lease, exchange or otherwise dispose of effluent containing foreign water after distribution through Denver's water system and collection in its sewer system.

■ A statute adopted in 1969 apparently authorizes Denver to re-use, make successive uses, and after use to have the right of disposition of imported water, subject, of course, to its contractual obligations otherwise. This statute reads:

"Whenever an appropriator has heretofore, or shall hereafter lawfully introduce foreign water into a stream system from an unconnected stream system, such appropriator may make a succession of uses of such water by exchange or otherwise to the extent that its volume can be distinguished from the volume of the streams into which it is introduced. Nothing in this section shall be construed to impair or diminish any water right which has become vested." 1969 Perm. Supp., C.R.S. 1963, 148-2-6.

Even without the statute we think that Denver has the rights of re-use, successive use and disposition of foreign water, subject again to contrary contractual obligations.

---

1. Denver has not reached this point as yet. The record reflects that Denver's research is continuing, and that in the future potable water will be extracted from sewage for delivery to the water mains.

*Comrie v. Sweet,* 75 Colo. 199, 225 P. 214 (1924) and *Ripley v. Park Center Land and Water Co.,* 40 Colo. 129, 90 P. 75 (1907), involved developed water or allegedly developed water produced from mining operations. As the term was used in those opinions, "developed water" is that water which has been added to the supply of a natural stream and which never would have come into the stream had it not been for the efforts of the party producing it. *See* 47 *Denver Law Journal* 356. In *Ripley* the water was judicially determined to be "developed water," and the sale of it by the developers to downstream users was validated as against holders of decrees in the stream. If these developers had instead made a completely consumptive use of the water, we believe this court would still have ruled that the holders of stream priorities could not complain. It follows that the developers without hindrance could use, re-use, make successive use of and dispose of the water. As far as the claims of defendants here are concerned, we see no distinction between the rights of owners of developed water from a mine and the rights of Denver as to its imported water. *See San Luis District v. Prairie Ditch Co.,* 84 Colo. 99, 268 P. 533 (1928); and Martz, *Seepage Rights in Foreign Waters,* 22 Rocky Mt. L. Rev. 407.

While the issues presented here are of first impression in this court, Mr. Justice Stone proceeded some distance toward our ruling, in *Brighton Ditch Co. v. Englewood,* 124 Colo. 366, 237 P.2d 116 (1951), when he said: ". . .appropriators on a stream have no vested right to a continuance of importation of foreign water which another has brought to the watershed. *Stevens v. Oakdale Irr. Dist.,* 13 Cal. (2d) 343, 90 P. (2d) 58." His citation of *Stevens* is interesting and significant. As one of the great Colorado water authorities, Mr. Justice Stone knew the distinct differences between California water law and Colorado water law. The citation demonstrates that this court was concurring in the applicable portion of *Stevens.*

In *Stevens,* the irrigation district conveyed water from the Stanislaus River to the Lone Tree Creek basin where it was stored and used for irrigation. The watershed and drainage

area of the Stanislaus River was entirely different from that of Lone Tree Creek. For many years seepage from the district's reservoir proceeded down Lone Tree Creek and was appropriated by Stevens and other downstream users. Then the district constructed a dam by means of which the seepage was collected, thereby depriving the downstream appropriators of its use. The California Supreme Court held that, since foreign waters were involved, the district was entitled to recapture the seepage. The court quoted from Wiel, *Mingling of Waters,* 29 Harv. L. Rev. 137 and 25 Cal. L. Rev. 124 as follows:

" 'The millowner [who has imported water from one river to another] may cease to operate his conduit across the divide, or may cease to operate his mill, or his water wheels, or may change his location, or otherwise take away or alter, in whatever way he pleases, the artificial source of the flow into Second River. This principle is well settled in the decisions.' "

In order to minimize the amount of water removed from Western Colorado, eastern slope importers should, to the maximum extent feasible, reuse and make successive uses of the foreign water. This goal was recognized in the decree of the United States District Court for the District of Colorado which fixed the priorities of Blue River water imported by Denver and the City of Colorado Springs. (Civil proceedings Nos. 5016 and 5017, 1955). The decree contained the following provisions:

"[E]ach city undertakes to exercise due diligence, within legal limitations and subject to economic feasibility. To that end, the City and County of Denver and the City of Colorado Springs shall, respectively, submit to the Secretary of the Interior on or before December 31st of each calendar year, beginning with the year 1957, a report showing by months for the water year ended September 30th last past, the quantities of water diverted by the reporting city from the Colorado River System, and whether and to what extent such water was used directly or placed in storage. After each city commences use of Blue River water said report shall also show by months for the same period the quantities of return

flow from their municipal uses of such Colorado River water accruing to the South Platte River and to Fountain Creek, respectively, as measured at the gauging stations provided for herein. Each such report shall also show what steps, by legal action or otherwise, the reporting city has taken during the period covered by the report to utilize such return flow by exchange or otherwise to the extent water of the Colorado River System is included therein, so as to reduce or minimize the demands of such city upon Blue River water. The United States of America reserves the right, at any time after use of Blue River water commences hereunder, to apply to this Court for injunctive or other remedial orders, suspending or proportionately reducing diversions or imposing conditions upon the taking of Blue River water by the particular city, if the United States shall establish as a fact that the particular city has failed to exercise due diligence in taking, with respect to return flow of water of the Colorado River System, all steps which, in view of legal limitations and economic feasibility, might reasonably be required of such city in establishing, enforcing, utilizing or operating a plan designed to accomplish said reduction by such city of its Blue River water use."

The decree was based partially upon stipulations of the parties. One attorney here was counsel in those proceedings. In his brief he asserts — correctly, we believe — that the foregoing quoted provision was placed in the decree at the insistence of counsel for Western Colorado users.

The defendants argue more forcefully against Denver's disposition of water after use than against its re-use and successive use. The principal argument against Denver's disposition after use arises from the apprehension of defendants that Denver will use primarily important water during the irrigation season, the recaptured portions thereof going to Denver's transferees. Defendants further fear that Denver will use primarily natural South Platte River basin water in the non-irrigation season, thereby depriving the defendants of the portions thereof returned to the stream. If and when such a situation arises, the rights and equities of the defendants and

others similarly situated can be much better protected by the State Engineer, acting under appropriate legislation, than by any judicial pronouncements. As we are unaware of the existence of statutes of this nature, we make a judicial declaration in the premises. Such a use by Denver would be arbitrary and unreasonable and would unconstitutionally deprive the defendants of the use of their water rights. If, prior to the implementation of necessary legislation and State Engineer's rules, Denver ever legally makes disposition of imported water before or after use, it cannot depart substantially from its practice during the past several years of returning water originating in the South Platte basin during the irrigation season.

The trial court determined that, absent negating circumstances, Denver had the right of re-use, successive use and disposition after use of foreign water. This, of course, we affirm. We do not agree, however, and reverse, the following determination of the trial court:

"It is the Court's ruling that pursuant to the evidence in this case [Denver's] dominion [over imported water] is lost at the customer tap delivery, but in any event the loss is final and complete at the point of delivery of Denver's sewage to the Denver Metropolitan Sewer intake line, and no question of loss of dominion at the point Denver's sewage is mixed with that of 15 other municipalities and governmental entities, processed on secondary treatment and delivered to Metro's outfall line to the South Platte River as treated effluent.

\* \* \*

"[I]dentity of the water is lost, including dominion thereof, that such water has been abandoned with the result that no participant member in the Metro District would have any legal claim or right to any particular percentage of volume of the return sewage effluent, regardless of the source of the water, be it wells, South Platte River water or other transmountain water."

As in *Metropolitan Sewage District v. Farmers Reservoir and Irrigation Co.*, 179 Colo. 36, 499 P.2d 1190, announced

simultaneously with this opinion, we confine ourselves here to water used within Denver and recaptured by Denver's sewer system. Denver partially treats some of this sewage and delivers that partially treated and additional raw sewage to Metro, which treats it and places the effluent therefrom in the South Platte River. We have held in the other opinion that Metro is merely an agent of Denver and other municipalities delivering sewage to it, and rights and responsibilities as between Denver and downstream irrigation users are the same as if Denver itself treated its sewage and returned it to the stream.

■ We hold that when Denver delivers water to a customer tap, it does not lose dominion over the water later returning to its sewer.

It was stipulated that Denver keeps records designed to disclose the amounts of various classes of water which it diverts, stores and distributes. The stipulation as to facts further provides as follows:

"Adequacy of Denver's water accounting is not now an issue in this proceeding. If it is determined, as a matter of legal principle, that Denver has a right to make successive uses of transmountain water, it is agreed that Denver will have the burden of demonstrating the identity of the transmountain water which it proposes to make a successive use of, in order to exercise such right.

"The amounts of water put into the potable water distribution system by Denver, delivered into sanitary sewer systems, and discharged into the South Platte River are measured to the extent traceable or determined by calculations, interpolations, interpretations or estimates, based on measurements. Because of the variability of demand and supply and the multiplicity of sources of water supply for the Denver water system, the most effective and efficient manner of operation so as to be able to demonstrate sources of sewer effluent can be gained only in the light of growing experience. It is not the intent of this Stipulation to relieve Denver of the burden of demonstrating the sources of sewage effluent and Denver's dominion on an ever continuing basis."

■ There is no issue in this case as to quality of water. With the question of quality not involved, we accept Denver's argument that water is fungible or is to be treated the same as a fungible article. The particles of water do not have to be identified as coming from Western Colorado, but rather water, whether or not contained in effluent, can be divided volumetrically. A percentage of the effluent discharged by the Metro plant can be considered as imported water. Under the stipulated facts, we do not need to go into the processes of division of the water. We note with approval the stipulation that Denver will have the burden of demonstrating the identity of transmountain water.

The trial court, as quoted earlier, found that Denver had abandoned the foreign water upon delivery of sewage and effluent to the Metro plant. As we interpret the findings and conclusions, the court limited itself to a finding of abandonment solely by reason of such delivery to the Metro plant. The briefs contain some argument concerning abandonment in a broader sense. We are asked to adopt the following interesting observations in *Stevens v. Oakdale Irr. Dist.,* 13 Cal. 2d 343, 90 P.2d 58 (1939), mentioned earlier in this opinion:

"Waters brought in from a different watershed and reduced to possession are private property during the period of possession. When possession of the actual water, or corpus, has been relinquished, or lost by discharge without intent to recapture, property in its ceases. This is not the abandonment of a water right but merely an abandonment of specific portions of water, i.e., the very particles which are discharged or have escaped from control."

We neither accept nor reject this California ruling.

■ Denver made quite a good record to the effect that it has never intended to abandon any imported water and that, possibly since its first transmountain diversion, it has had in mind for the future the re-use, successive use and disposition after use of foreign water. Since the trial court did not pass upon the issue of abandonment except in the narrow area above indicated, we do not believe that the issue

of abandonment should become *res judicata* with this opinion, except as to our ruling that delivery of sewage and effluent to Metro does not constitute abandonment. If the defendants or others wish to press the issue of abandonment for reasons other than delivery to the Metro plant, it will have to be in another proceeding.

II.

Denver has large streambed reservoirs, notably Antero, Eleven Mile, and Cheesman. Our statute provides as follows: "Upon order of the state engineer there shall be released from the water in storage in each stream bed reservoir such quantities of water as, in the determination of the state engineer, are necessary to prevent evaporation from the surface of such reservoir from depleting the natural flow of the stream running through such reservoir which would otherwise be available for use by other appropriators. In determining the quantity of any evaporation release under this section, the state engineer shall compute the surface evaporation from the reservoir and deduct therefrom any accretions to the stream flow resulting from the existence of the reservoir and any natural depletions to the stream flow which would have resulted if the reservoir were not in existence." 1965 Perm. Supp., C.R.S. 1963, 148-7-17(5).

Historically, Denver has not released water from its reservoirs to compensate for depletion of stream flow resulting from evaporation on the surface of the reservoirs. Rather, it has operated its reservoirs according to "gauge height," meaning that it discharges from the reservoirs only the amount of water in the stream flowing therein at any particular time.

Prior to 1939 Denver discharged sewage from the Elyria sewer[2] into the Burlington Ditch. In about 1937 Denver's Northside sewage plant went into operation. This caused a cessation of discharge of sewage into the Burlington Ditch. Conferences between representatives of the users of

---

2. There was a town named Elyria which later became a part of Denver.

water flowing in the Burlington Ditch and representatives of Denver commenced, the former desiring to have Denver in some manner replace water for the eliminated sewage. The result was that under date of May 1, 1940, Denver entered into a written agreement with a number of ditch companies. At this time, as previously mentioned, Denver was bringing foreign water through the Moffat Tunnel and was commencing its diversion through the August P. Gumlick Tunnel. This agreement provided that Denver might continue its practice of operating its streambed reservoirs on the basis of gauge height. Further, Denver obligated itself as follows:

"It is understood and agreed that the City and County of Denver may make or permit any nonconsumptive use of water to create electric power, to dilute sewage, or the like while such water is on its way to its place of principal and ultimate beneficial use; and the City agrees that it will not use or attempt to use or lease any water, irrespective of source, which shall have been once used through its municipal water system and such water shall be allowed to become part of the nearest convenient natural water course."

Under date of December 4, 1969, Denver and Coors entered into an agreement whereby Coors was to divert water near the confluence of Clear Creek and the South Platte River, and Denver was to replace that water in the river with effluent from the Metro plant. If the 1940 agreement is valid and is in full force and effect, then Denver's agreement with Coors is invalid. Denver argued (1) that the above quoted provision of the 1940 agreement had been terminated, and (2) that the 1940 agreement was invalid as it constituted transfer of property in violation of the provisions of Denver's charter. The trial court ruled adversely to Denver on both propositions, and we are in accord.

The 1940 agreement contained the following:

"If any substantial part of this agreement shall become impossible of performance by reason of enforcible order of governmental authority, the entire agreement shall then terminate and, as of that date, all parties be restored to their former status exactly as if the agreement had never been made."

██ Denver's contention that the 1940 agreement has been terminated is predicated upon a letter dated August 16, 1966, addressed to the Secretary-Manager of Denver's Board of Water Commissioners by the Division Engineer of Irrigation Division No. 1:

"In compliance with the Amendment to 148-7-17, Colorado Revised Statutes of 1963, pertaining to evaporation losses of channel reservoirs, it becomes necessary to request the release of water from Antero, Eleven Mile, and Cheesman Reservoirs, computed in acre feet, for the months of May, June, and July of this year, as follows:

|            | May        | June       | July       |
|------------|------------|------------|------------|
| Antero     | 265 A.F.   | 342 A.F.   | 244 A.F.   |
| Eleven Mile| 1017 A.F.  | 1281 A.F.  | 859 A.F.   |
| Cheesman   | 275 A.F.   | 243 A.F.   | 162 A.F.   |
|            | 1557 A.F.  | 1866 A.F.  | 1265 A.F.  |

"The total evaporation release for the above months is 4688 Acre Feet. This water should be released over the next 30-day period at a rate of 78 cubic feet per second of time, commencing on or about August 22, 1966.

"We hope this can be accomplished without too much difficulty and will be agreeable to the Water Board.

"We have discussed these releases with Mr. Robert Fischer and Mr. Ed Cecil as to the possibility of more feasible means of handling the evaporation charges in the future."

In response to this letter the Secretary-Manager on August 22, 1966, replied to the Division Engineer as follows:

"This will acknowledge receipt of your letter of August 16, 1966 regarding evaporation from Antero, Eleven Mile and Cheesman Reservoirs.

"Section 148-7-17(5) of the 1963 Revised Statutes, concerning reservoir evaporation losses, is an addition adopted a little more than a year ago. Members of the Denver Water Board staff have met with you and the State Engineer recently to discuss the methods which you have used in determining the reservoir releases thought necessary to prevent evaporation

losses from our State Platte reservoirs from depleting the flow of the river and thereby reducing the amounts of water available for use by other appropriators. We feel that we understand the method of analysis used and recognized it as a not unreasonable estimating method considering the limited information available. However, we also recognize, as you undoubtedly do, that the resulting estimates may or may not accurately reflect actual conditions at our South Platte reservoirs.

"If, in fact, evaporation losses from our reservoirs are of the magnitude shown in your letter of August 16, 1966, it is our belief that return flows from our transmountain diversions more than offset such losses. It appears to us that our method of accounting for the presence of such return flow in the South Platte River is at least as accurate, and probably more accurate, than any methods we are aware of for determining net evaporative loss.

"If our return flow accretions to the South Platte River are in fact adequate to meet any calls which would have been impaired by evaporative losses from our reservoirs, we believe we have effectively created an exchange of return flow back to our reservoirs and that therefore no release should be made of any water as suggested in your letter of August 16th.

"Statutory controls on our streams were increased in the 1965 Legislative Session. We expect more legislation in the future and a complete strengthening and extension of the authority of the State Engineer to see that our rivers are more completely administered according to law than they have been in the past. We are well aware of the heavy responsibilities of your office and of the handicaps under which your office has operated. We are a large diverter of water and our diversions have many complexities because of the transmountain diversions and the large extent of our system.

"Under these circumstances, we feel obligated to give you the benefit of the best possible cooperation. We would like to have appropriate personnel from our organization meet with you or those whom you may select to analyze the facts

pertinent to your letter of August 16th in the expectation that the true state of affairs can be agreed upon and that when this is done, there will be no basis for any disagreement between us."

There was testimony to the effect that the state water authorities were satisfied with Denver's explanation and method of compensating for evaporative losses. Denver has not changed its practice. The record fully supports the finding of the trial court that the agreement has not been terminated.

■ On May 1, 1940, Denver's charter contained the following provision:

"[N]o water rights owned or acquired by the city and county shall ever be sold, leased or otherwise disposed of except upon a vote of the qualified electors first had and obtained. . ." 1953 Compilation, Denver Charter, Art. XIX, Sec. 296.

Denver contends that the 1940 agreement constitutes a disposition of water proscribed by the quoted charter provision, and cites *Denver v. Miller,* 149 Colo. 96, 368 P.2d 982 (1962). As much as we would like to agree with this point of view, we cannot do so. The 1940 agreement did not make a disposition of water, but rather provided for the manner in which Denver would use its water. *Miller* involved a conveyance of water, and does not apply here.

■ We can visualize that the amount of foreign water returned to the river after use far exceeds the evaporative loss from Denver's streambed reservoirs. If so, the effect of the 1940 agreement is to create a bonanza for the defendants and other downstream users at the expense of Denver and Western Colorado. Certainly the agreement runs contra to the portion of the Blue River decree mentioned earlier. Denver argues that the 1940 agreement has the effect of a taking without due process of law. With this proposition we are unable to agree, but point out that the plaintiffs did not request in their declaratory judgment action a determination of whether the 1940 agreement has become void as against public policy by reason of the wastage thereunder or perhaps

for other reasons. Neither did the plaintiffs request a determination as to whether the agreement applies to water not appropriated at the time the agreement was made. We, of course, can express no opinion concerning these possible contentions.

The judgment is affirmed in part and reversed in part.