**CITY AND COUNTY OF DENVER, Acting By and Through its BOARD OF WATER COMMISSIONERS, Applicant–Appellant/Cross–Appellee,**

v.

**The CITY OF ENGLEWOOD, Opposer–Appellee/Cross–Appellant,**

**and**

**The City of Thornton; Centennial Water and Sanitation District; the City of Aurora; the Farmers Reservoir and Irrigation Company, and the Burlington Ditch, Reservoir and Land Company; and the State Engineer and Division Engineer, Water Division No. 1, Opposers–Appellees.**

**No. 90SA474.**

Supreme Court of Colorado,
En Banc.

March 23, 1992.

---

Wayne D. Williams, Michael L. Walker, Casey S. Funk, Sara Duncan, Denver, for applicant-appellant/cross-appellee.

Hutchinson, Black, Hill & Cook, David G. Hill, Michael E. Miner, Boulder, for opposer-appellee/cross-appellant.

White & Jankowski, Michael D. White, Bruce D. Bernard, Denver, for opposer-appellee City of Thornton.

Justice ERICKSON delivered the Opinion of the Court.

This case involves the City and County of Denver's application for a quadrennial finding of reasonable diligence and a request to make certain conditional water rights absolute. Statements of opposition were timely filed by the City of Englewood and the City of Thornton. The water referee ruled in favor of Denver. Englewood and Thornton protested the referee's ruling, and trial to the District Court, Water Division No. 1, was held on February 5, 6, and 7, 1990. The water rights that are the subject of Denver's application and this appeal are Denver's conditional rights to divert water by exchange as decreed by the Douglas County District Court in Civil Action 3635 on May 18, 1972 (C.A. 3635).

On June 18, 1990, the water court entered an order continuing Denver's conditional water rights to the use of the South Platte River until May 31, 1992. However, the water court declined to make any of the conditional water rights absolute, finding that certain exchanges claimed by Denver subsequent to the entry of a conditional degree in C.A. 3635 were not valid. The water court also listed March 21, 1962, as the priority date of Denver's rights in the Strontia Springs Reservoir.

The issues on appeal are: (1) whether the water court erred in finding that the statement of claim in C.A. 3635 did not provide notice of Denver's intent to substitute Colorado River water, including transmountain effluent from the Metropolitan Waste Water Reclamation District waste water treatment plant (Metro Sewer), for waters of the South Platte River and that the statement of claim, therefore, did not allow such an exchange; (2) whether the water court erred in determining that the use of the "owe-the-river" account as a substitute supply at Chatfield Reservoir was insufficient to effectuate an exchange; (3) whether the water court erred in setting the priority date of the exchange of water from Chatfield Reservoir to Strontia Springs Intake as March 21, 1962, instead of 1980; and (4) whether the water court erred by requiring the next reasonable diligence application to be filed by May 31, 1992.

We hold that the water court erred in declining to make water rights absolute

based on Denver's replacement of Colorado River water, including Metro Sewer transmountain effluent. However, the water court was correct in determining that the use of the "owe-the-river" account as a substitute supply at Chatfield Reservoir was insufficient to effectuate an exchange. Accordingly, we affirm the determination of the water court not to make the decree absolute as to 137 cfs. We reverse the water court determination that May 31, 1992, is the date the next reasonable diligence application is due and remand to the water court to amend its order by entering a date six years from its most recent finding of reasonable diligence. *See Darby v. All J Land & Rental Co.*, 821 P.2d 297 (Colo.1991). Finally, we affirm the water court determination that the priority date of the exchange from Chatfield Reservoir to Strontia Springs Intake is March 21, 1962.

In 1968, C.A. 3635 was commenced, pursuant to the 1943 Adjudication Act, 1963 C.R.S. § 148–9–1 to –27, *repealed by* ch. 373, sec. 20, 1969 Colo.Sess.Laws 1200, 1223, to adjudicate the priorities to the right to use water for all beneficial purposes in Water District No. 8, Irrigation Division No. 1.[1] Denver filed a statement of claim in C.A. 3635 to secure its right to priority over other water users to divert water[2] by exchange from the South Platte River in Water District No. 8.[3] Denver's claim included the following points of diversion in Water District No. 8: Cheesman

**1.** The 1943 Adjudication Act provided in part:

For the purpose of hearing, adjudicating and settling all questions concerning the priority of appropriation of water between owners and claimants of water rights drawing water from the same source within the same water district, and all other questions of law and questions of right growing out of, or in any way involved or connected therewith, jurisdiction is hereby vested exclusively in the district court of the county in which said water district exists....

1963 C.R.S. § 148–9–2.

**2.** Under the current statute, " '[d]iversion' or 'divert' means removing water from its natural course or location, or controlling water in its natural course or location, by means of a ditch, canal, flume, reservoir, bypass, pipeline, conduit, well, pump, or other structure or device."

§ 37–92–103(7), 15 C.R.S. (1990) (originally enacted as 1963 C.R.S. § 148–21–3(5) (Perm.Cum.Supp.1969)). In contrast, " '[a]ppropriation' means the application of a specified portion of the waters of the state to a beneficial use pursuant to the procedures prescribed by law." § 37–92–103(3)(a) (original version at 1963 C.R.S. § 148–21–3(6) (Perm.Cum.Supp.1969)).

**3.** At the time of the 3635 decree, Water District No. 8 consisted of

all lands irrigated by ditches taking water from Cherry creek, Plum creek and Platte river and their tributaries, except Bear creek, above water district No. 2 [beginning at the Cherry Creek confluence], and below the forks of the north and south branches of the South Platte river, and including all lands and ditches in Douglas county.

1963 C.R.S. § 148–13–9.

Reservoir, the Roxborough Diversion Facility, the Denver Platte Canyon Intake, the Highline Canal Diversion Works, Marston Reservoir, Platte Canyon Reservoir, and the Farmers and Gardeners Ditch Diversion Works. Denver listed the "South Platte River and drainage tributary thereto" as the source of supply for the diversions and claimed an appropriation date of July 4, 1921.

The record does not reflect that any opposition was made to Denver's statement of claim in C.A. 3635.[4] In 1972, after hearing testimony and taking evidence, the water court entered its decree in C.A. 3635. Under the heading "Exchange within Denver Water System," the decree granted Denver the right to divert up to 3000 cfs from the South Platte River System and its tributaries in Water District No. 8 for all municipal uses,

> such uses to be repetitive to the fullest extent possible within the limit of physical and economic feasibility as found by Denver, together with the practice of using any of said waters for the purpose of effectuating an exchange or transfer of water by the use of any public stream or its water in substitution for water supplied or taken by claimant, including the right to precedence over others claiming or using a like or similar process.

The points of diversion under the decree included Cheesman Reservoir, the Roxborough Diversion Facility, the Denver Platte Canyon Intake, the Highline Canal Diversion Works, Marston Reservoir, Platte Canyon Reservoir, and the Farmers and Gardeners Ditch Diversion Works. The decree set the priority date of the water rights granted therein as

> July 4, 1921, except to the extent the diversion is made by means of a struc-

ture shown above which has a decreed priority later than July 4, 1921. When the diversion is made by means of such a structure it shall have a priority dated the same date as the priority date for such structure.

The water court found that, as of the date of the decree, Denver had diverted 454 of the decreed 3000 cfs by exchange for water made available at the points of diversion set forth in the decree. Consequently, the water court made the decree absolute as to 454 cfs and conditional as to the remaining 2546 cfs.

On August 29, 1984, the District Court, Water Division No. 1 in Case No. W–8783–77, modified the decree in C.A. 3635 to add Chatfield Reservoir as an additional point of diversion by exchange under the "Exchange within Denver Water System" water right.[5] The change added Chatfield Reservoir to the original list of diversion points as "a new alternate and supplemental point of diversion and place of storage." Under the supplementary Chatfield decree, Denver "may divert and store by exchange at the rate of 3,000 cubic feet of water per second of time as of July 4, 1921, ... the waters of the South Platte River at and in the Chatfield Reservoir." The decreed uses for Chatfield Reservoir included "all municipal uses ... irrigation replacement, and the adjustment and regulation of the units of the Denver municipal water system within themselves and with other water users."

On May 29, 1986, Denver filed the application that is in issue in this case. Denver claimed that on July 8, 1985, it diverted 606 cfs from the South Platte River System and its tributaries in Water District 8 to the Denver Municipal Water System and

---

4. 1963 C.R.S. § 148–9–7 required the water court to notify all owners or claimants of any water right in the water district, except those that had already been adjudicated, to file a statement of claim, to appear for the taking of evidence in regard to the claim, and to appear if they wished to resist a claim.

5. Section 37–92–305(3), 15 C.R.S. (1990), requires the referee or water judge to approve a change of water right "if such change ... will not injuriously affect the owner of or persons

entitled to use water under a vested water right or a decreed conditional water right." On December 30, 1977, Denver initiated the change of water right to add Chatfield Reservoir as an additional point of diversion by filing an application for confirmation of water rights. The water court found that all required notices had been given. Both the City of Thornton and the City of Englewood filed statements of opposition to Denver's application.

applied that water to beneficial use as provided by C.A. 3635. Denver requested the court "to enter Findings and a Decree that 606 c.f.s. was exchanged and placed to the decreed beneficial uses, thereby making 606 cfs of water absolute and continuing the remaining 2,394 cfs." [6]

Englewood and Thornton opposed Denver's application. Thornton claimed that Denver had "not diligently pursued completion of the water right. [Denver] must provide strict proof of reasonably diligent efforts to complete the conditional water right." Englewood stated that it owned numerous water rights out of the South Platte River, "including rights to use the waters of the Platte River for exchange, its water rights having priorities as early as November 23, 1960, and for varying dates and amounts both for direct use and for storage, some of those water rights bearing very recent dates." It stated that the application did not indicate what Denver had done toward applying "the waters claimed to be appropriated to a beneficial use."

On August 19, 1986, the Division Engineer for Water Division No. 1 issued a summary of a consultation that was held on August 5, 1986, regarding Denver's application. The division engineer

> recommended that approval not be granted unless [Denver] submits evidence to the Court proving:
>
> > 1. The amount of water exchanged within the system, in priority, and beneficially used....

On October 3, 1988, the water court referee ruled that Denver's right to 591 cfs was absolute and continued Denver's conditional rights to the remaining 2,409 cfs. The referee found,

> On July 9, 1985, the [Denver Water] Board exchanged 325 cfs from Chatfield Reservoir to Strontia Springs Reservoir; 157 cfs from Chatfield Reservoir to Cheesman Reservoir; and 109 cfs from Metro Sewer to Strontia Springs Reservoir. After this exchange the water was

released and diverted into the Denver Municipal Water Works System and placed to the various beneficial uses described in [the decree in C.A. 3635].

Accordingly, the referee ordered that "an additional 137 cfs is hereby made absolute bringing the total decreed absolute to 591 cfs."

The referee reported that previous findings of diligence had been filed in 1972, 1974, 1978, and 1982. Finding that Denver had "engaged in activities necessary to develop the subject conditional water rights during the diligence period," the referee ordered "that the remaining conditional right (2,409 cfs) is hereby continued in full force and effect until the last day of May, 1990."

Thornton and Englewood protested the referee's ruling. Thornton protested that portion of the referee's ruling that made absolute a portion of the conditionally decreed exchange within the Denver water system on the grounds that it was not specific enough as to "which potential exchanges are included as part of the 'Exchange Within the Denver Water System,' which stream reaches are potentially affected, or what flow reaches can potentially be exchanged over various stream reaches." Englewood protested the ruling on the grounds that it did not provide for adequate accounting to prevent injury to Englewood, which has water rights to the South Platte River with points of diversion between Strontia Springs Reservoir and Metro Sewer Outfall, and that the actual accounting has been so unsatisfactory as to cause injury.

In the subsequent trial before the water court, *see* § 37–92–304, 15 C.R.S. (1990), evidence was presented that, on July 8, 1985, Denver diverted 498 cfs from Strontia Springs Reservoir, Cheesman Reservoir, Eleven Mile Canyon Reservoir, and Antero Reservoir. On July 9, 1985, substitute supplies of 368 cfs were released into the South Platte River from storage at Chatfield Reservoir. A bookkeeping entry was

---

**6.** Denver later reduced its claimed exchange to 591 cfs (or 137 cfs in addition to the amount already decreed absolute).

made at Chatfield Reservoir to indicate that Denver "owed the river" 130 cfs after the releases had been made. Englewood and Thornton disputed the use of the "owe-the-river" account to effectuate the claimed exchange. Englewood and Thornton also questioned the validity of the exchanges, contending that the decree in C.A. 3635 only authorizes water taken from the South Platte River to be exchanged for South Platte River water. Denver's expert in water resource engineering and raw water operations, William G. Bates, of the Denver Water Department, testified that, in his expert opinion, the source of the 325 cfs released into the South Platte from Chatfield in exchange for water diverted at Strontia Springs Reservoir from South Platte River tributaries was "transmountain bypass," or transmountain water from any of Denver's west slope sources. In addition, Bates testified that the source of 109 cfs released into the South Platte River from Metro Sewer was effluent that was the product of and resulted from the importation of transmountain water.

On June 18, 1990, the water court found that Denver had been diligent and entered a decree continuing Denver's conditional water rights. However, the court declined to follow the referee's decision in making an additional 137 cfs absolute. The water court based the latter decision on its finding that the statement of claim in C.A. 3635 did not provide notice of the use of Colorado River water, including Metro Sewer transmountain effluent and that the decree did not approve these exchanges. Additionally, the water court determined that, while an exchange need not be simultaneous, the "owe-the-river-account substitute supply [used] at Chatfield Reservoir is insufficient."

The water court established March 21, 1962, as the priority date of Denver's exchange of water from Chatfield Reservoir to Strontia Springs Reservoir and Intake. The court set August 1990, as the date for the filing of the next diligence application, but later amended its order to extend the time for filing to May 31, 1992, in an effort to comply with section 37–92–301(4)(a), 15 C.R.S. (1990), which amended section 37–92–301(4), 15 C.R.S. (1973).

## I

Englewood and Thornton contend that the decree in C.A. 3635 failed to give notice that either transmountain effluent, including Colorado River water, including Metro Sewer transmountain effluent, would be introduced as a source of substitute supply for water diverted from the South Platte River or that substitute water would be introduced below Water District 8. Therefore, Englewood and Thornton assert Denver may not use such water for an exchange on which to base absolute water rights. We disagree.

Before we can determine whether Denver's replacement of South Platte River water with Colorado River water and effluent was a valid exchange on which absolute water rights may be based, we must construe and interpret the decree granting Denver the conditional water rights. *See Orchard City Irrigation Dist. v. Whitten,* 146 Colo. 127, 133, 361 P.2d 130, 133 (1961). *Orchard* required this court to determine the validity of a 1955 ruling by the state engineer construing and interpreting a 1937 decree. We held that the statement of claim and transcripts of testimony given in the adjudication proceedings for the 1937 decree were admissible in evidence to enable the court to construe and interpret the decree. *Id.* at 134–36, 361 P.2d at 134–35. In interpreting the decree here we may consider Denver's statement of claim and the supporting transcripts of testimony in C.A. 3635.

Under the 1943 Adjudication Act, an original adjudication of water rights is initiated by filing a statement of claim. Section 148–9–8 required that a statement of claim contain in relevant part: (1) the claimant's name; (2) the name of the diverting structure; (3) a general physical description of such structure; (4) the name of the source of supply and location of point of diversion; (5) the appropriation date; (6) the amount of water claimed; and (7) the character of uses. 1963 C.R.S. § 148–9–8 (repealed 1969). We have previ-

ously interpreted the 1943 Act to require a claimant to specify the source from which the water is to be diverted. *See City & County of Denver v. Vail Valley Consol. Water Dist.*, 751 P.2d 68 (Colo.1988).

Thornton and Englewood contend that, in the case of an exchange of water, the claimant must also specify the source of the water with which the diverted water is to be replaced. Englewood contends that Denver's statement of claim in C.A. 3635 did not contemplate the replacement of South Platte River water with Colorado River water, including Metro Sewer transmountain effluent. It asserts that the reference to an exchange using "any public stream" was not sufficient because in 1968, when Denver filed its statement of claim, there was no right to reuse effluent or imported water.[7] Without specific notice, interested parties would not be alerted of "the nature, scope and impact of the proposed diversion." *See Monaghan Farms, Inc. v. City & County of Denver*, 807 P.2d 9, 16 (Colo.1991). Thus, Englewood concludes that the statement of claim was insufficient.

 Even if we assume that Englewood is correct that notice was necessary to provide downstream appropriators sufficient opportunity to protect their rights, the statement of claim and testimony in C.A. 3635 was sufficient to allow the use of Colorado River water, including transmountain effluent from Metro Sewer. One purpose of a statement of claim in the adjudication of water rights is to provide notice to other water users of the water rights claimed by the applicant. The purpose of notice is "to ensure that interested parties have a meaningful opportunity to participate in judicial water right determinations that may affect their vested rights." *Monaghan Farms*, 807 P.2d at 15.

Both Denver's statement of claim and the water court's decree stated that the water rights were for all municipal uses, such uses to be repetitive to the fullest extent possible within the limits of physical and economic feasibility as found by Denver, together with the practice of using any of said waters for the purpose of effectuating an exchange or transfer of water by the use of any public stream or its water in substitution for water supplied or taken by claimant, including the right to precedence over others claiming or using a like or similar process, especially as such procedures affect the waters of the South Platte River in Water District No. 8 to the extent of the amounts and flows above set forth.

Denver's statement that "an exchange ... by the use of any public stream or its water in substitution for water supplied or taken by" Denver was sufficient to put interested parties on inquiry notice that sources other than South Platte River water might be introduced in replacement for water taken from the South Platte. *See Monaghan Farms*, 807 P.2d at 15 ("receipt of inquiry notice charges a party with notice of all the facts that a reasonably diligent inquiry would have disclosed"); *cf. Vail Valley*, 751 P.2d at 73 (statement of claim interpreted as ordinary person would). Thus, interested parties were alerted to make further inquiry into the source of replacement water. In addition, even though the record does not reflect any opposition to Denver's claim, the water court found that the testimony before the referee in C.A. 3635 indicated that the use of transmountain water or effluent in the subject exchanges could be anticipated.

Englewood's contention that interested parties were not sufficiently alerted to Denver's intention to use imported water and effluent is similarly without merit. In *City & County of Denver v. Fulton Irrigating Ditch Co.*, 179 Colo. 47, 52, 506 P.2d

---

7. Currently, an appropriator who introduces imported water into a stream system has at least a limited right to reuse the water it imports. *See* 37–82–106(1), 15 C.R.S. (1990); *City & County of Denver v. Fulton Irrigating Ditch Co.*, 179 Colo. 47, 51, 506 P.2d 144, 146 (1972) (right to reuse

and make successive uses of imported water). The predecessor to section 37–82–106(1), which first granted appropriators the right to reuse imported water, was enacted in 1969. *See* 1963 C.R.S. § 148–2–6 (Perm.Cum.Supp.1969).

144, 147 (1972), we stated, "Even without the statute [that grants the right to reuse imported water, 1963 C.R.S. § 148–2–6 (Perm.Cum.Supp.1969),] we think that Denver [the appropriator] has the rights of reuse, successive use and disposition of foreign water...." Since the right to reuse effluent or imported water existed in 1968, when Denver's statement of claim was filed, the effluent and imported water here was encompassed by the phrase "any public stream" in Denver's statement of claim and the water court's decree.

We conclude that the statement of claim and the testimony in C.A. 3635, were sufficient to alert downstream appropriators that Denver sought the right to divert South Platte River water in exchange for Colorado River water, including transmountain effluent from Metro Sewer.

## II

■ The water court found that the bookkeeping entry of 130 cfs in Denver's "owe-the-river" account was insufficient to effectuate an exchange and declined to make water rights absolute based on the claimed exchange. The water court determined that section 37–83–104, 15 C.R.S. (1990), does not require a simultaneous introduction of a substitute supply. However, it determined that Denver "cannot make [a nonsimultaneous] exchange until the Division Engineer is satisfied [Denver] can accurately identify reusable sources to effectuate the exchange." Finding that the division engineer was not informed of the claimed exchange until after the water had been diverted, the water court concluded that Denver's use of the "owe-the-river" account as a substitute supply was too vague to comply with the statutory requirements. We agree.

The statutes that allow for exchanges of water do not require that the delivery of water be simultaneous with the appropriation in order to effectuate an exchange. See, e.g., §§ 37–82–106, 37–83–101, 37–83–104, 15 C.R.S. (1990). They do, however

give the division and state engineers significant responsibilities in the operation of exchanges. Section 37–83–101, directs the state engineer to determine the amount of water involved in an exchange:

**Transfer from one stream to another.** Whenever any person or company diverts water from one public stream and turns it into another public stream, such person or company may take out the same amount of water again, less a reasonable deduction for seepage and evaporation, to be determined by the state engineer.

Section 37–83–104 requires that exchanges not injure the rights of others and directs the state engineer to determine the amount of water. The division engineer is given the responsibility to see that exchanges are just and equitable. Section 37–83–104 states:

**Reservoirs and ditches may exchange.** When the rights of others are not injured thereby, it is lawful for the owner of a reservoir to deliver stored water into a ditch entitled to water or into the public stream to supply appropriations from said stream and take in exchange therefor from the public stream higher up an equal amount of water, less a reasonable deduction for loss, if any there be, to be determined by the state engineer. The person or company desiring such exchange shall be required to construct and maintain, under the direction of the state engineer, measuring flumes or weirs and self-registering devices at the point where the water is turned into the stream or ditch taking the same or as near such point as is practicable so that the division engineer may readily determine and secure the just and equitable exchange of water.

Denver contends that the exchange took place when the bookkeeping entry was made reflecting the amount of water Denver owed the river because at that point the state engineer assumed control over the actual release of the water from Chatfield.[8]

---

**8.** The operation of an exchange is the province of the state and division engineers. See § 37–83–104. Chatfield Reservoir is operated by the

United States Corps of Army Engineers under the direction of the state engineer. When Denver takes water from the South Platte that is to

We disagree. Although the amount of water in Denver's "owe-the-river" account is determined by the division or state engineer's decision to release or hold the replacement water, Denver's accounting method was insufficient to effectuate an exchange to the extent that Denver took water from the South Platte before notifying either the division or state engineer that a corresponding release would be required and was available. In order for the division and state engineers to effectively exercise their discretion in administering water rights so as to protect the rights of downstream senior appropriators, the engineers must be informed in advance of a diversion that might affect those rights. Prior notification of the exchange allows the engineers to ensure that water is available to be released to meet the needs of downstream senior appropriators. If, however, notification takes place after the diversion has been made, downstream senior appropriators requiring water may be injured before the replacement water is available. Allowing the party to proceed without notifying the state engineer places the engineers' statutory discretion in the hands of the exchanging party.

Besides giving the state and division engineer significant discretion over the operation of an exchange, the statutes assign the engineers functions that require them to be aware of the exchange prior to its operation. For example, section 37–83–104 charges the state engineer with the determination of the amount of water an appropriator may take in an exchange. *See* § 37–83–102 (appropriator may take amount equal to that delivered into the stream "less a reasonable deduction for loss, if any there be, to be determined by the state engineer"). The water court found "that the Division Engineer and Water Commissioner were made aware of the alleged exchange *subsequent* to the operation of the claimed exchange."

be replaced with water released from Chatfield, it informs the division engineer, who is supervised by the state engineer. § 37–80–105, 15 C.R.S. (1990). The state engineer then has discretion either to release the water or to hold it until a demand is placed by a downstream sen-

We conclude that section 37–83–104 does not require the introduction of a substitute supply to be simultaneous with withdrawal. However, a nonsimultaneous release and diversion may only effectuate an exchange when proper notification has been given to the state or division engineer and it is evident that water is available for the release. Prior notification is necessary to protect the rights of downstream appropriators by ensuring that water will be available to downstream priorities. Since Denver failed to give proper notice in advance of the diversion, Denver's "owe-the-river" accounting method was an insufficient basis for an exchange and cannot support a decree of absolute water rights.

## III

■ In Exhibit A of the water court's June 18, 1990, decree, the court listed the date of appropriation, March 21, 1962, as the priority date for the exchange from Chatfield Reservoir to Strontia Springs Intake. Englewood asserts that the priority date is 1980, the date the application was filed for the determination of water rights for Strontia Springs Intake. We agree with the water court. The decree in C.A. 3635 states that Denver's right of exchange for the "Exchange within Denver Water System" has a priority date of

> July 4, 1921, except to the extent the diversion is made by means of a structure shown above which has a decreed priority later than July 4, 1921. When the diversion is made by means of such a structure it shall have a priority dated the same date as the priority date for such structure.

The Strontia Springs Intake [9] was listed as a point of diversion, but had not yet been constructed when the decree was entered.

In 1983, after construction of the Strontia Springs Intake, the water court issued

ior appropriator. *See* § 37–80–120(1), 15 C.R.S. (1990).

9. At the time the decree in C.A. 3635 was entered, the Strontia Springs Intake was known as the Roxborough Diversion Facility and was referred to as such in the decree.

two decrees awarding water rights to Denver for the Strontia Springs structures based on applications filed in 1980. In Case No. 80CW408 the water court granted Denver conditional water rights for Foothills Tunnel and Conduit No. 26, to divert water from the South Platte River by means of the Strontia Springs Diversion Dam. In Case No. 80CW406 the water court granted Denver conditional water rights for the Strontia Springs Diversion Dam and Reservoir. Both decrees state:

> The date of appropriation: March 21, 1962. . . .
>
> . . . .
>
> . . . The priority herein awarded said Strontia Springs Diversion Dam and Reservoir was filed in the Water Court in the year of 1980 and shall be administered as having been filed in that year; and shall be junior to all priorities filed in previous years. As between all rights, filed in the same calendar year, priorities shall be determined by historical dates of appropriation and not affected by the date of entry of ruling.

Englewood asserts that the water court misinterpreted the Strontia Springs decree in listing March 21, 1962, as the date of appropriation. It contends that the decreed priority date is 1980. Denver asserts that Englewood mistakenly applies the Water Right Determination and Administration Act of 1969, §§ 37–92–101 to 37–92–602, 15 C.R.S. (1990 & Supp.1991) (1969 Act), to arrive at a priority date the same as the date of filing the application for determination of the Strontia Springs water rights. We need not determine whether the Strontia Springs decrees are governed by the 1969 Act or the 1943 Act because in either case the result is the same—the priority date is determined by the date of appropriation.

Under the doctrine of prior appropriation, the priority of water rights is determined according to the date of appropriation. *E.g.*, *United States v. Bell*, 724 P.2d 631 (Colo.1986). The 1943 Act required the water court to specify the priority date of each appropriation, 1963 C.R.S. § 148–9–13(2)(f) (repealed 1969), to be determined

with reference to the appropriation: "The decree to be entered by the Court at the conclusion of each adjudication shall determine and establish the several priorities of right, *by appropriation of water*, of the several ditches, reservoirs and other structures in the water district. . . ." § 148–9–13(1) (emphasis added). The 1969 Act similarly requires the court to grant a priority date that is the same as the date of appropriation: "In the determination of a water right the priority date awarded shall be that date on which the appropriation was initiated if the appropriation was completed with reasonable diligence." § 37–92–305, 15 C.R.S. (1990). The water court did not list a priority date separate from the date of appropriation. We interpret the water court decree as establishing the priority date as March 21, 1962, the date of appropriation.

■ Englewood asserts that the postponement doctrine requires us to hold that the priority date is 1980, the date the application was filed, rather than the date of appropriation.

> The postponement doctrine provides that when a court enters a statutory decree in the same water district where a previous properly rendered statutory decree has been entered:
>
> > the decrees take rank and precedence in order of time of rendition: the doctrine being first in order of time, first in right of priority . . . the earliest priority in the second proceeding, must be of a later date and number than the latest or lowest priority awarded in the first proceeding, and the earliest numbered priority in a second must be the next consecutive number after the latest numbered priority of the first proceeding.

*South Adams County Water & Sanitation Dist. v. Broe Land Co.*, 812 P.2d 1161, 1163–64 (Colo.1991) (quoting *Huerfano Valley Ditch & Reservoir Co. v. Hinderlider*, 81 Colo. 468, 473, 256 P. 305, 307 (1927)). The postponement doctrine governs the administration of water rights adjudicated in different decrees or applied for

in different years.[10] The doctrine does not affect the actual priority dates and is not applicable in this case. We said in *United States v. Bell*,

> Priority of appropriation determines the *relative priority* among water rights or conditional water rights awarded in one calendar year, but, regardless of the date of appropriation, water rights or conditional water rights decreed in one year are necessarily junior to all priorities awarded in decrees in prior years.

*Bell*, 724 P.2d at 641–42 (emphasis added). "Under the postponement doctrine, water rights adjudicated in a previous decree are senior to water rights adjudicated in a subsequent decree on the same stream, regardless of their dates of appropriation." *South Adams County Water & Sanitation Dist. v. Broe Land Co.*, 812 P.2d at 1164; *City & County of Denver v. Colorado River Water Conservation Dist.*, 696 P.2d 730, 739 n. 8 (Colo.1985) ("Under the 1943 Act, each priority adjudicated in a supplemental adjudication is junior to those adjudicated in a prior adjudication suit.").

Section 148–9–13(3) states the postponement doctrine as it existed under the 1943 Act:

> In case a prior decree has been rendered by the court in any adjudication fixing irrigation or nonirrigation priorities from the same source, each priority adjudicated shall be junior and inferior to those theretofore adjudicated, and the decree shall so indicate as to each such junior priority which bears a date earlier than the latest priority date awarded in the last prior adjudication.[11]

Similarly, under the postponement doctrine as enunciated in the 1969 Act, the priority dates establish the relative priorities of water rights filed in the same calendar year:

> With respect to each division described in section 37–92–201, the priority date awarded for water rights or conditional water rights adjudged and decreed on applications for the determination of the amount and priority thereof filed in such division during each calendar year shall establish the *relative priority* among other water rights or conditional water rights awarded on such applications filed in that calendar year; but such water rights or conditional water rights shall be junior to all water rights or conditional water rights awarded on such applications filed in any previous calendar year....

§ 37–92–306, 15 C.R.S. (1990) (emphasis added). Thus, under the 1969 Act a water right filed in a previous year is senior to a water right filed in a subsequent year, and the priority dates are not affected.

Since the Strontia Springs decrees list only an appropriation date and a filing date, and do not list a separate priority date, we affirm the water court finding that Denver's priority date for the exchange from Chatfield Reservoir to Strontia Springs Intake is March 21, 1962, the date of appropriation.

## IV

■ Denver states that the water court erred in requiring the next application for reasonable diligence to be filed by May 31, 1992. We agree.

Under section 37–92–301(4)(a), 15 C.R.S. (1990) (amending section 37–92–301(4), 15 C.R.S. (1973)), the filing deadline should be determined from the date of the most recent decree. *Darby v. All J Land & Rental Co.*, 821 P.2d 297 (Colo.1991). The water court here determined the date for the filing with reference to the date of the original decree. In accordance with our decision in *Darby*, we reverse the entry of May 31, 1992, as the deadline and remand to the water court with directions to amend

---

**10.** The 1969 Act applies the postponement doctrine according to the years in which the water rights applications were filed. *See* § 37–92–306, 15 C.R.S. (1990). The 1943 Act applies the postponement doctrine according to the decrees in which the water rights were adjudicated. *See* § 148–9–13(3).

**11.** For example, a water right with a 1964 priority date that was adjudicated in 1966 would be senior to a water right with a 1962 priority date that was adjudicated in 1967.

the order by striking May 31, 1992, and inserting June 30, 1996.

## V

Accordingly, we reverse the water court determination that, under the decree in C.A. 3635, Colorado River water or effluent and Metro Sewer effluent may not be used as sources of substitute supply for an exchange of South Platte River water. We affirm the determination that Denver's owe-the-river bookkeeping entry at Chatfield Reservoir, indicating that it owed 130 cfs of water to the South Platte River, did not effectuate a valid exchange. We also affirm the water court listing of March 21, 1962, as the priority date of Denver's exchange from Chatfield Reservoir to Strontia Springs Reservoir and Intake. We direct on remand that the May 31, 1992, date for the next reasonable diligence filing be stricken and that the water court enter June 30, 1996, as the time for filing the application for reasonable diligence pursuant to section 37–92–301(4)(a), 15 C.R.S. (1990). Finally, we remand for a further hearing on the exchange of water rights in accordance with the directions contained in this opinion. The water court made no findings and the record is not clear as to the time sequence of the exchange, notice to the state engineer, or the operation and the amounts exchanged. On remand, the water court is to determine when notice was given to the state engineer for the exchange, the manner in which the exchange was to become operational, the amounts exchanged, and based on its findings, whether Denver is entitled to have an absolute decree entered as a result of the operation of the exchange.